# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **S.S.**, a minor by his mother and next friend | ) | |
| **TAMIKA SHANK** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TAMIKA SHANK** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No 1:08-cv-214 (ESH) |
| | ) | |
| **HOWARD ROAD ACADEMY** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **LATONYA HENDERSON** (officially as | ) | |
| C.A.O. Howard Road Academy) | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Come now, the Plaintiffs, by and through undersigned counsel, and request that this

honorable Court grant summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

This action is an appeal of a November 5, 2007 Hearing Officer's Determination ("HOD"),

issued following an administrative due process hearing, wherein a Hearing Officer concluded

that Howard Road Academy ("HRA") student S.S. did not require a full time special education

placement and was not denied a Free Appropriate Public Education ("FAPE") under the

Individuals with Disabilities Education Improvement Act ("IDEIA").   Plaintiffs herein present

evidence which establishes that there are no genuine issues as to any material fact and that they

are entitled to judgment as a matter of law.  This Court should overturn the HOD because the

Hearing Officer was wrong and the Plaintiffs are entitled to judgment based on a preponderance of the evidence presented at the due process hearing, contained in the Court and administrative records.   As explained herein, the Hearing Officer failed to consider extensive evidence presented by the Plaintiffs at the administrative due process hearing.  The HOD ignores many of the legal issues raised in the due process hearing request and fully litigated at the due process hearing.  Moreover, the HOD contains conclusions which are directly contrary to the evidence presented at the hearing.  At the administrative level Plaintiffs established that HRA denied S.S. a FAPE, that S.S. requires a full time special education placement and that S.S. is entitled to compensatory education to remedy the denial of FAPE.

Plaintiffs have attached a Statement of Material Facts as to Which There is No Genuine Issue and a Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment.  Based upon this documentation, Plaintiffs respectfully request that this Court enter an Order granting Plaintiffs' Motion for Summary Judgment.

Respectfully Submitted,

   /s/ Donna Wulkan
Donna L. Wulkan, Esq.
D.C. Bar Number 370961
1765 N Street, NW
Carriage House
Washington, DC 20036
202-682-3909 (phone)
202-955-1015 (fax)
Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **S.S.**, a minor by his mother and next friend ) | |
| **TAMIKA SHANK** ) | |
| ) | |
| and ) | |
| ) | |
| **TAMIKA SHANK** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No 1:08-cv-214 (ESH) |
| ) | |
| **HOWARD ROAD ACADEMY** ) | |
| ) | |
| and ) | |
| ) | |
| **LATONYA HENDERSON** (officially as ) | |
| C.A.O. Howard Road Academy) ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I.     **Introduction**

        S.S. is a thirteen year old seventh grader who has been diagnosed with a language based

learning disorder and a reading disorder.  S.S. attended Howard Road Academy Public Charter

School ("HRA") from fourth grade through the first half of seventh grade.  HRA is a charter

school located in the District of Columbia which has elected to be its own Local Education

Agency ("LEA") under the IDEIA for special education purposes.  While a student at HRA, S.S.

received special education services pursuant to yearly IEPs.

On August 17, 2007, Tamika Shank filed a Complaint requesting an administrative due process hearing. The Complaint alleged that HRA had denied S.S. a free appropriate public education ("FAPE") and sought as relief funding and placement at a full time special education school and compensatory education. The due process hearing was held on October 23, 2007 and the HOD was issued on November 5, 2007. The Hearing Officer found that the Plaintiffs had not met their burden on any of the issues and did not award any relief.

On February 6, 2008, Plaintiffs appealed the HOD by filing a Complaint before this Court. On March 19, 2008, Plaintiffs filed an Amended Complaint. Defendants filed a Motion to Dismiss on May 29, 2008 and on June 27, 2008 the Judge granted in part and denied in part that Motion. Plaintiffs were instructed to file their Motion for Summary Judgment on or before August 15, 2008.

II.    **Overview of IDEIA**

Congress enacted the Individual with Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. §§ 1400-1487 "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A)(2005), 34 CFR 300.101(2008), 5 DCMR 3000.1 & 30002.1(2006). For each child who has been identified as eligible for special education, the school district must develop an Individualized Education Program ("IEP") that complies with the IDEIA requirements. 20 U.S.C. § 1412(a)(3) & 1412(a)(4)(2005); 34 CFR 300.101(b)(2008), 5 DCMR 3002.1(d) & 3002.3(2006). If the parent feels that the school system has denied the student the FAPE to which he is entitled under the

4

IDEIA they can file a request for an administrative due process hearing.  20 U.S.C. § 1415(6)(2005), 34 CFR 300.507(2008), 5 DCMR 3029(2006).

Pursuant to the D.C. School Reform Act, charter schools in the District of Columbia can elect to be Local Education Agencies ("LEA Charters") or District of Columbia Public Schools ("District Charters") for special education purposes.  D.C. Code § 38-1802.10(c)(2008), 5 DCMR 3019.1(2006).  LEA Charters are responsible for ensuring compliance with the IDEIA.  D.C. Code § 38-1802.4(c)(5)(2008), 5 DCMR 3019.2 & 3019.3 (2006).  This includes responsibility for "special education evaluations, and, if necessary, IEPs and placements for children with disabilities enrolled in their facilities."  5 DCMR 3019.6 (2006).  If an LEA charter school does not provide a child with FAPE, the parent can file a request for a due process complaint naming the LEA Charter as the Defendant.  5 DCMR 3019.13 (2006).  LEA charters are responsible for providing their own legal representation at the due process hearing and are also "responsible for implementation of all agreements or decisions resulting from, mediation and due process hearings involving children enrolled in their school."  5 DCMR 3019.13 (2006).

III.    **Factual Background**

S.S. is a thirteen year old boy who was a student at HRA during his fourth grade year, school year 2004-2005, and through his seventh grade year, school year 2007-2008.  AR 478.  He has been diagnosed with a language based learning disorder and a reading disorder.  AR 244 & 249.  Every year that S.S. was at HRA, he had an IEP that provided he was to receive special education services.  AR 207, 216, 225 & 372.

During school year 2004-2005, when S.S. was in the 4th grade, his IEP was developed on January 11, 2005.  AR 207.  This IEP identifies S.S. as a student with a learning disability and

provides that he is to receive 12 hours a week of specialized instruction and one hour a week of speech and language therapy.  AR 207.

S.S.' next IEP was developed during school year 2005-2006, when he was in the 5th grade.  The IEP, which was developed on January 18, 2006, identifies S.S. as a student with a learning disability and provides that he is to receive 12 hours a week of specialized instruction and one hour a week of speech and language therapy.  AR 216.

The next IEP was developed during school year 2006-2007, when he was in the 6th grade.  The IEP, which was developed on February 27, 2007, identifies S.S. as a student with a learning disability and states that he is to receive 17 hours a week of specialized instruction, one hour a week of speech and language therapy and one hour a week of psychological counseling.  AR 225.

S.S.' grades dropped between his 5th and 6th grade years; in the 5th grade he earned mostly Bs and Cs and in the 6th grade he earned mostly Ds and Fs.  AR 246, 271 & 272.  According to testing conducted by HRA and done in April 2007, S.S.' "skills in Broad Reading, Math, and Spelling were in the Low Average and below grade and age expectation."  AR 249.  Because the evaluation did not contain the data, it is impossible to know what exact scores S.S. earned on this academic testing.  AR 246-9.  The evaluation recognizes that his failing grades are affected by the "increased demands of sixth grade in conjunction with skill deficits in core areas."  AR 249.

In the spring and early summer of 2007 Dr. Laura Wilding, who was qualified as an independent expert at the due process hearing, conducted a psychological evaluation of S.S.  AR 241-5.  At the time of the testing S.S. was in the sixth grade (and had been retained one time), but testing revealed that his sight word reading was equivalent to that of a third grader and his

phonemic decoding efficiency was equivalent to that of a second grader.  AR 241-2.   Dr.

Wilding also reported that S.S. was reported to be at risk for hyperactivity, aggression, conduct

problems, anxiety, depression, somatization, atypicality, withdrawal and attention problems.  AR

243.  She diagnosed him with a language based learning disability as well as a reading disability.

AR 244.  Dr. Wilding stated that he would be "most successful in a highly structured classroom

with a low student-to-teacher ratio" and also recommended "individualized, systemic, daily

reading instruction by a reading specialist."  AR 244.

On August 15, 2007, HRA convened an Multi Disciplinary Team ("MDT") meeting to

review evaluations of S.S.  AR 237-8.  They reviewed a psychological evaluation conducted in

April 2007 by Charla White, Psy. D., and the above described psychological evaluation done by

Dr. Laura Wilding.  AR 246-50 & 241-5.  The MDT team reported that these evaluations, noting

that Dr. Wilding's findings were "suggestive" of a language based learning disability and a

reading disorder.  AR 237-8.   They also specifically noted that Dr. Wilding's findings regarding

S.S. emotional issues.  AR 237.  The parent's educational attorney pointed out to the team that

review of S.S.' 2005 and 2007 evaluations showed that he had not made progress in the last two

years.  AR 238.  The parent requested that he be placed in a full time special education

placement.  AR 238.  The team made no changes to S.S.' IEP or placement.  AR 238.

Because of HRA's failure to make adjustments to S.S.' IEP and placement, on August 17,

2007 the parent filed her request for a due process hearing.  AR 159-161.  In her request she

raised a number of complaints against HRA.  These included that in the past two years, in

violation of the IDEIA and DCMR HRA: failed to develop an appropriate IEP, failed to ensure

that S.S. made academic and emotional progress, failed to provide the appropriate level and

amount of special education service and failed to provide an appropriate special education placement.  AR 160.  As relief she request placement and funding at a full time special education placement and compensatory education services.  AR 160-161.

Subsequent to the filing of the due process hearing request, HRA developed a full time special education IEP for S.S.  AR 371.  On August 27, 2007, HRA convened an MDT team and changed the cover sheet of S.S.' IEP to increase the number of hours of specialized instruction to 25 hours a week, full time specialized instruction.  AR 371.  On September 7, 2007 HRA mailed a referral packet containing the new IEP to DCPS to secure a full time special education placement for S.S..  AR 25.  The packet also contained a "Site Review Consideration Form" which stated that S.S. needed to be placed in an out of general education setting.  AR 26.

On September 26, 2007, S.S. was accepted into Accotink Academy ("Accotink").  AR 277.  Accotink is a full time special education placement for students with learning disabilities.  AR 279.  "The classes are small, with a low student-to-teacher ratio." AR 280.  The instruction is individualized and staff uses instructional materials and methodology that is tailored to the learning style and developmental needs of the students.  AR 280.  "Students are supported in their learning and educational functioning by service staff from Speech/Language ... and Clinical Psychology, as identified in their IEPs."  AR 280.  The school uses a multi-disciplinary approach to ensure that all of the students' needs are met.  AR 280.

The administrative due process hearing was held on October 23, 2007.[1]  AR 396.  The Hearing Officer presiding over the case was Terry Banks.  AR 399.  At the hearing the parent presented the live witness testimony of three witnesses: mother Tamika Shank, expert psychologist Dr. Laura Wilder, and Accotink school director and speech and language pathologist Anne Warnke.  AR 398.  The parent moved into evidence 33 exhibits. AR 157-8.[2]

The Hearing Officer's Determination was issued on November 5, 2007. AR 3.  The Hearing Officer concluded that the parent failed to meet her burden of proof on any of the issues and dismissed the case.  AR 3-12.  On February 6, 2008 the parent filed a Complaint appealing the Hearing Officer's Determination before this Court.

On February 15, 2008, Accotink Academy renewed their acceptance of S.S. and agreed to accept him without pre-approved funding.  Amended Complaint ¶ 40.  That same day the parent sent a letter to HRA and DCPS notifying them of S.S.' unilateral placement at Accotink and her intent to seek reimbursement for the placement.  Amended Complaint ¶ 41.  DCPS responded that they were willing to fund a full time special education placement for S.S. and agreed to fund him at Accotink Academy.  On February 20, 2008, DCPS issued a Notice of Placement for Accotink Academy and arranged for transportation services.  Amended Complaint ¶ 41 & 42.

---

[1] Subsequent to the filing of the due process hearing request and before the hearing began there were a number of pleadings filed wherein HRA attempted to join DCPS.  The issue of whether or not DCPS is a necessary party will not be addressed herein for a number of reasons.  At the administrative level the Hearing Officer decided on the record that DCPS was not a party (AR 432).  The Plaintiffs have not challenged this ruling and the Defendants did not file a cross complaint alleging that this finding was in error.  Moreover, when Defendants raised this argument as part of their May 29, 2008 Motion to Dismiss, it was expressly rejected by the Court.  This Court's June 25, 2008 Order concluded that DCPS is not a necessary party.  Memorandum and Order at 6, dated June 25, 2008.

[2] Counsel for HRA objected to Exhibits 21, 22 and 30 and the Hearing Officer sustained these objections. AR 6 & 403-6.  Plaintiff does not challenge these decisions.

S.S. started Accotink Academy on February 27, 2008 and has been a student there since.

Amended Complaint ¶ 43.

IV.   **Standard of Review**

A.   *Standard of Review for Summary Judgment*

To be granted summary judgment, Plaintiffs must demonstrate that there are no issues of

material fact as to which there is a genuine dispute, and that they are entitled to judgment as a

matter of law. Fed. R. Civ. Pro. 56(c), <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "In

judicial review of administrative decisions under the IDEA, summary judgment is often

particularly appropriate." <u>D.W., et al. v. D.C., et al.</u>, 2008 U.S.Dist. LEXIS 48074, *7 (D.D.C.

2008)(*citing* <u>Hawkins ex rel. D.C. v. D.C.</u>, 539 F. Supp. 2d 108, 112 (D.D.C. 2008)). Where, as

here, neither party seeks to introduce additional evidence, a motion for summary judgment

operates as a motion for judgment on evidence comprising the record. <u>Anthony v. District of

Columbia</u>, 463 F.Supp.2d 37, 40 (D.D.C. 2006).

B.   *Standard of Review of Hearing Officer's Determination*

A decision made at a due process hearing is final, except that any party aggrieved by the

findings and decision shall have the right to appeal those findings in a district court of the United

States. 20 U.S.C. §§1415(i)(1)(A) & (2)(A)(2005). In reviewing the determinations of IDEIA

due process hearings, the Court must determine whether a plaintiff is entitled to judgment based

on a preponderance of the evidence contained in the Court and administrative records. <u>Board of

Education of the Hendrick Hudson Central School District, et al. v. Rowley</u>, 458 U.S. 176, 205

(1982), 20 U.S.C. §1415(i)(2)(C)(2005). This standard "does not authorize unfettered de novo

review." <u>Hawkins ex rel. D.C. v. District of Columbia</u>, 539 F.Supp.2d 108, 112 (D.D.C. 2008).

Instead, 'consideration of the record impliedly requires courts to give 'due weight' to the administrative proceedings,' and courts 'upsetting a hearing officer's decision must at least explain [their] basis for doing so.'" D.W., et. al. v. District of Columbia, 2008 U.S. Dist. LEXIS 48074, *7 (D.D.C. 2008). The "party challenging the administrative determination must at least take on the burden of persuading the court that the hearing office was wrong, and that a court upsetting the hearing officer's decision must at least explain its basis for doing so." Kerkam, et al. v. McKenzie, et al., 862 F.2d 884, 887 (U.S. App. D.C. 1989).

"[C]ourts reviewing administrative dispositions under the IDEA enjoy a significant degree of discretion in issuing a determination. The Court in Reid emphasized that the 'IDEA plainly suggests less deference than is conventional in administrative proceedings.'" D.W. at *7 (internal citations omitted)(see also Kerkam, 862 F.2d at 887, wherein the United States Court of Appeals for the District of Columbia Circuit found that "the district court's authority under §1415(e) to supplement the record below with new evidence, as well as Congress's call for a decision based on the 'preponderance of the evidence,' plainly suggest less deference than is conventional.")

In order to determine how much deference to give an HOD, the reviewing Court must consider the specifics of the HOD before them. A "hearing decision 'without reasoned and specific findings deserve[s] little deference'". D.W. at *7 (citing Reid v. District of Columbia, 401 F.3d 516, 521 (D.D.C. 2005). Also, "where the Hearing Officer did not focus on all the relevant issues and therefore could not properly analyze whether FAPE would be provided at a particular school, the court need not place as much weight on the administrative decision as it might in other cases." Gellert, et al. v. District of Columbia Public Schools, 435 F.Supp.2d 18,

*25 (D.D.C. 2006).  If the district court finds a violation of the Act, it "shall grant such relief as the court determines is appropriate." 20 U.S.C. §1415(i)(2)(C)(iii)(2005), Sch. Comm. Of Burlington v. Dep't of Educ., 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985).

This Court should not give the HOD in this case due weight because as set forth below, Plaintiffs will show by a preponderance of the evidence that the Hearing Officer was wrong. The HOD was not well-reasoned.  The Hearing Officer omits virtually all witness testimony and makes blatantly incorrect statements of fact and conclusions of law.   The HOD contains no findings on major issues properly plead and litigated at the due process hearing.  Plaintiffs are entitled to summary judgment because there is a preponderance of evidence before this Court and in administrative record that HRA denied this student a FAPE, that he required a full time special education placement for students with learning disabilities and that he is entitled to relief in the form of compensatory education.

V.    **Analysis**

    A.    *The Court Should Lend Minimal Weight to the Hearing Officer's Determination.*

        1.    The Court should give only minimal weight to the HOD because the Hearing Officer did not focus on all the relevant issues and could therefore not properly analyze whether there had been a deprivation of FAPE.

            a.    Hearing Officer did not address the appropriateness of delivering S.S.' specialized instruction services in a large general education classroom.

The HOD deserves minimal deference from this Court for a number of reasons.  First, the Hearing Officer totally ignored one of the main issues raised at the hearing, the appropriateness of delivering S.S.' specialized instruction services in a large general education classroom..  In their request for due process hearing, Plaintiffs specifically alleged:  "In violation of the IDEIA

and DCMR, Howard Road Academy failed to develop an appropriate IEP" and "[i]n violation of the IDEIA and DCMR, Howard Road Academy failed to provide an appropriate special education placement." AR at 160.

The parent presented evidence through documents and live witness testimony that S.S. received his specialized instruction in the general education classroom with almost 30 children. AR 729 & 641-2.  S.S.' February 27, 2007 IEP, one of the documents the parent entered into evidence at the hearing, provided that he was to receive 17 hours a week of specialized instruction from the special education teacher.  AR 97.  The IEP also provided that the services were to be delivered "in General Education with/services".  AR 105.  HRA witness Donna Johnson, the special education coordinator, confirmed that S.S.' specialized instruction was being delivered in the general education classroom.  AR 641-642.

One of the main theories of the parent's case, on which they presented evidence at the hearing, was that S.S.'s IEP was inappropriate and denied him a FAPE because it called for his specialized instruction to be delivered in the general education classroom rather than a self contained special education classroom.  The theory was first set forth in the opening statement. AR 455-7 & 459-60.  Plaintiffs' qualified expert witness, Dr. Laura Wilding Jones (hereinafter referred to as Dr. Laura Wilding)[3], testified that the delivery of services in the general education classroom (an inclusion setting) has not been successful with S.S.  AR 556.  At the hearing counsel for the parent asked qualified Dr. Wilding about this issue directly:

> Q:   And do you believe that he requires a self-contained setting, i.e., a fulltime
>       special education setting?

---

[3]Dr. Wilding's extensive resume is set forth in the pages 281 through 289 of the administrative record. Based on her extensive experience she was qualified, without any objection from HRA, as an expert witness at the due process hearing.  AR 530.

A:    Yes I do.

Q:    And why do you think that?

A:    Well, I think he has shown that it's not possible for him to interact and learn in a setting as large as the setting that he is in right now. And he is going to need to get services where all the other children are getting services as well. And that is – that is what a self-contained setting would do for him. It would provide him with the needed services in an environment that's going to be a low kind of stimulation environment, few kids, enough support, and just constantly reinforcing all the skills that – that they need him to learn throughout every class that he is in.

AR 571-2.

Plaintiff presented evidence at the hearing that because of his learning disability a general education classroom with almost 30 children was an inappropriate placement for S.S. to receive any of his education. Testimony revealed that this type of setting has too much stimulation and distraction for S.S. and he was embarrassed to be receiving his special education services in the main stream classroom. Dr. Wilding's own evaluation of S.S. revealed that he has a language based learning disability. AR 244. When asked how this disability would affect his "ability to function in a classroom, say, with 32 children in the classroom" she responded:

Well, I think that he is going to have difficulty being able to follow orally represented instructions that maybe [*sic*] presented to the class as a whole, and if you've got a class full of 32 children and you've got a child in [*sic*] having difficulty understanding, I think, it's going to make it difficult for him to be able to focus in and pay attention. ... So, if you're going to – if you have a difficulty following direction then its definitely going to come out in his, especially in his language based work that he is asked to do.

AR 539-40. She also testified that "I think that having a large class when you've got a child who's got difficulty understanding what's being said to him, it's going to make it even more challenging for him to get direction, understand what he's supposed to do, follow with the flow

14

of what's expected of the class, that's going to be very difficult for him." AR 560. Dr.

Wilding's prediction was confirmed by the testimony of S.S.'s mother, who testified that "[S.S.]

says he doesn't understand" what is happening in the classroom. AR 489.

 HRA's own speech and language pathologist, Iva Alexander, made observations that

were in line with Dr. Wilding's observations in her March 2007 Speech and Language

Evaluation, which was entered into evidence at the hearing and referred to in live witness

testimony. AR 251-6. Ms. Alexander's evaluation noted that S.S. has deficits in receptive

language and significant weakness "following multi-step oral directions that contain 1 to 3 -

level sequences" and in his "ability to a) listen to spoken sentences of increasing length and

complexity, and b) repeat the sentences without changing word meanings ... or sentence

structure." AR 254. She concluded that as a result of these deficits:

> Concepts & following directions: [S.S.] may experience school and home
> related difficulties in following directions orally and in curricular
> workbooks (such as English, Math & Sciences) and may have difficulty
> taking notes or writing messages.
>
> Recalling Sentences: [S.S.] may experience difficulties in the classroom in
> his ability to remember spoken sentences of increasing complexity in
> meaning and structure that is required for following directions and
> academic instructions, writing to dictation, note taking, learning
> vocabulary and related words, and subject content.

AR 254. Dr. Laura Wilding testified that her own testing of S.S. revealed these weaknesses.

AR 541. She testified that when she was testing S.S. she observed that he "was having

difficulties formulating sentences appropriately [and] identifying words." AR 541-2.

 The parent also presented evidence that delivery of special education services in a the

general education setting was having a negative emotional impact because S.S. was struggling

academically and did not want to be singled out from his peers. In her testimony, Dr. Wilding

opined that she saw "when you do have struggles in school, and especially, you know, in adolescence, which is a very difficult time without problems in school, we can see issues coming up with low self-esteem and sadness and depression and some anxiety." AR 566. S.S.'s mother testified that "when he come [*sic*] home with his work [homework], and he come home very emotional and crying, he sees it [poor grades] on his report card and it starts to make him not want to go to school." AR 494. As part of Dr. Wilding's 2007 psychological evaluation, both S.S. and Tamika Shank completed a checklist as part of the BASC assessment. The results from S.S. indicated that he feels sad, misunderstood, dislikes school and does not "really care anymore." AR 243. "Results were in the "at risk range on the following scales, according to [Ms. Shank]: Hyperactivity, Aggression, Conduct Problems, Anxiety, Depression, Somatization, Atypicality, Withdrawal, and Attention Problems." AR 243.

HRA's own witnesses testified that having his specialized education services delivered in the general education setting had a negative emotional impact on S.S.. Speech and language pathologist Iva Alexander testified that "if you come and stand over [S.S. to deliver services], he is opposed to it. And that's most of the time." AR 683. HRA school psychologist Bridgette Nelson testified that in February of 2007, Tamika Shank asked for counseling services because she was concerned that S.S. was depressed. AR 751. She further testified that she has been providing him counseling services to deal with the depression. AR 751. Importantly, she stated on the record that the "primary issue" that she and S.S. discussed in therapy was S.S.' reluctance to get help in classes, resulting from his embarrassment at being singled out as a special education student in a mainstream class. AR 751-2. She stated "[h]e is very sensitive toward correction or teacher correction. He tends to interpret it as criticism. And he appears to be

16

embarrassed." AR 752. Further proof that HRA knew about these emotional issues is found in a review of the notes of the August 2007 MDT meeting. AR 237-8. At the meeting HRA staff reviewed Dr. Wilding's evaluation and made special note of the results of the BASC assessment which found S.S. at risk for many serious emotional issues. AR 237. However, the MDT team did not propose any change or increase of services to address these emotional issues. AR 237.

At the due process hearing the parent presented expert testimony that placing S.S. in a small, self contained class setting with students who had similar learning issues would alleviate these emotional issues. Expert Dr. Wilding testified that:

> getting [S.S.] into a placement where he would be in a classroom full of other kids, a smaller setting full of other kids who are having the same sorts of difficulties that he has, where he realizes, you know, that I'm not the only one that's having these problems, I think would be a benefit to him as far as his learning as – in addition to his emotional wellbeing.

AR 558. She further testified that being in a class with children who have similar learning issues "will normalize it for him and I think will decrease his embarrassment, that feeling that he is so different from them." AR 584. In her expert opinion, S.S. should be in a self-contained (not general education) classroom with only six to nine children. AR 571 & 561. One of HRA's own witnesses, speech and language pathologist Iva Alexander, testified that S.S. "would benefit from a small, structured, language based classroom where the curriculum was designed for children who were reading and functioning at the same grade level that he is." AR 705. This description matches the classroom at Accotink Academy which was described by Accotink director Anne Warnke and recommended by expert Dr. Wilding. AR 280 & 598-610.

Despite all of the discussion about and testimony and evidence presented regarding the appropriateness of delivering S.S.' special education services in a general education classroom

setting with over 30 children, rather than a small, self contained setting, the HOD makes no mention whatsoever of the issue.  AR 6-13.  The Hearing Officer did not make a single finding of fact or conclusion of law about the appropriateness of delivering S.S.' specialized instruction in the general education classroom. AR 6-13.  The Hearing Officer did not make a single finding of fact or conclusion of law on any of the testimony regarding how much S.S. dislikes being singled out in the general education classroom and was consequently rejecting services and experiencing depression, anxiety and having other emotional issues . AR 6-13.  The Hearing Officer did not make a single finding of fact or conclusion of law about the appropriateness of S.S. being in a classroom with over 30 other children.  AR 6-13.  The fact that the services were not intense enough is supported by the evidence showing that S.S.' grades were dropping and he failed to make academic progress.

In a case similar to the one at bar, Gellert, et al. v. District of Columbia Public Schools, 435 F.Supp.2d 18 (D.D.C. 2006), a parent appealed an HOD which found that DCPS had not denied the student a FAPE.  The parent's request for due process hearing alleged that DCPS did not provide the student with an appropriate placement because the school could not accommodate his need for a small class size.  At the due process hearing the parent presented evidence to establish that the student required a small class size.  DCPS' only witness testified that the student's classes at the public school sometimes had as many as 30 students.  The Hearing Officer ignored all of the testimony regarding the small class size and concluded that DCPS had not denied the student a FAPE.  The parent appealed the HOD and in ruling on a Motion for Summary Judgment, Judge Gladys Kessler of the United States District Court for the District of Columbia stated "without addressing the main point of contention between the parties

18

- namely whether Wilson could accommodate [student]'s need for a small class size and related

services - the Hearing Officer could not have accurately determined whether [student] could

receive FAPE at Wilson."  Gellert, 435 F.Supp.2d at *23.  The Court concluded that the Hearing

Officer's conclusion that the school program at Wilson was reasonably calculated to provide the

student with educational benefit "'deserves little deference,' and is not supported by the

record.'" Id.  The Court's opinion summarized their rule, stating:

> In a case such as this one, where the Hearing Officer did not focus on all
> the relevant issues and therefore could not properly analyze whether
> FAPE would be provided at a particular school, the court need not place as
> much weight on the administrative decision as it might in other cases.

Id. at *25.

In the same manner in which the Hearing Officer in Gellert improperly ignored the main

issues raised at the hearing, Hearing Officer Banks totally ignored one of the main issues raised

at S.S.'s hearing - namely, the fact that HRA was not accommodating S.S.' need for a small, self

contained educational setting.  Without consideration of such a central issue, the Hearing Officer

could not have accurately determined whether or not S.S. could have received a FAPE at HRA.

Therefore, as in Gellert, this Court should give the Hearing Officer's findings that S.S.'s IEP and

placement at HRA were appropriate and could provide him educational benefit little deference

and find that they are not supported by the record.

> b.    The Hearing Officer did not address the parent's assertion that
>       HRA was not implementing S.S.' IEP because they were failing to
>       provide him with all of his specialized instruction.

This Court should only give minimal deference to the HOD because it does not address

the parent's properly plead and litigated allegation that HRA was not implementing S.S.' IEP.  In

her August 17th request for due process hearing the parent alleged that " [i]n violation of the

IDEIA and DCMR, Howard Road Academy failed to deliver the services indicated on the student's IEP." AR 160.

The parent presented evidence that S.S. was not getting all of hours of specialized instruction on his IEP. S.S.' February 2007 IEP provided that he was to get 17 hours a week of specialized instruction and these were to be delivered in a general education setting. AR 97 & 105. It is unclear how S.S. could possibly have gotten all of these hours of specialized instruction. Donna Johnson, the special education coordinator at HRA, testified about how LaToya Jones-Davis, the special education teacher, delivered S.S.' services. AR 641-3. Ms. Johnson testified that the special education teacher spent approximately three and a half hours a day working with S.S. AR 247. Ms. Jones-Davis testified that she served six special education students at HRA. AR 732. Of these, S.S. was to get seventeen hours a week of specialized instruction and the other five students were each to get between five and ten hours a week. AR 732. Accordingly, she agreed that she was delivering 57 hours of special education each week. AR 732-3. Since the school week only contains roughly 30 hours a week of academic instruction it is unclear how she could have been delivering 57 hours of specialized instruction in that time. She testified that when delivering the special education services in the classroom she was servicing S.S. at the same time as she was servicing two other students. AR 733-4. Given the sheer number of students that she was servicing, it is unclear how S.S. could have been receiving all of the hours of specialized instruction on his IEP.

This Court should only give minimal deference to the HOD because the Hearing Officer made no mention whatsoever of this issue in the HOD. AR 3-14. Neither the Findings of Fact, nor the Conclusions of Law mention this issue. An HOD which fails to address relevant issues,

such as whether or not a student is receiving all of the hours of specialized instruction on his

IEP, deserves only minimal deference.  Moreover, as set forth below, Plaintiffs have presented

enough evidence for this Court to find that HRA's failure to implement the IEP constitutes a

denial of FAPE.

> 2.    The HOD should be given minimal weight because the Hearing Officer
> virtually ignored the live witness testimony presented by the parent;
> without discrediting the parent's testimony, the HOD is based mainly on
> documentary evidence.

The second reason why this Court should only give minimal deference to the HOD is

because the Hearing Officer totally ignored most of the live witness testimony presented at the

hearing, instead choosing to quote at length documents which were in the record but not relied

upon at the hearing.  AR 6-11.  At the hearing the parent presented the live testimony of three

witnesses: Tamika Shank, Dr. Laura Wilding Jones and Anne Warnke.  AR 477-618.  This

testimony took hours to present and is relayed in 141 pages of the transcript.  AR 477-504, 528-

576 & 587-615.  The parent also did extensive cross examination of HRA's witnesses.  AR 633-

667, 687-705, 731-746 & 757-778.

The findings of fact in the twelve page HOD span eight pages and contain fifteen

findings of fact[4], but **the Hearing Officer only makes one finding of fact based on the**

**parent's live witness testimony,** the remainder are based primarily on documentary evidence.

To illustrate, the Hearing Officer's findings of fact are spelled out in the text of the HOD with

the basis of the findings identified in footnotes.  Footnotes 3-23, AR 6-11.  Of the 20 footnotes,

18 of them refer only to documentary evidence (footnotes 3-12, 14-22), one refers to

---

[4]The Hearing Officer misnumbers his Findings of Fact.  They are numbered one through sixteen, but there is no finding of fact number thirteen.  Therefore, there are in fact only fifteen findings of fact.  AR 10.

documentary evidence and testimony of an HRA witness (footnote 13) and one refers to the

testimony of a parent witness (footnote 23). The Hearing Officer does not discredit the parent's

witness testimony, or argue that contrary evidence was presented by HRA, the Hearing Officer

simply ignores all of the parent's testimonial evidence. AR 6-11. Despite qualifying Dr.

Wilding as an expert witness, he totally ignores her testimony. AR 6-11.

     Looking at it another way, of the 15 findings of fact in the HOD, only two of them

contain any mention of live witness testimony. Five of the findings of fact (findings 2, 3, 8, 10

and 12) are simply lengthy, verbatim excerpts of evaluations of S.S.. AR 6-10. Two findings of

fact are based on the Complaint (finding 1 & 15). AR 6 & 11. Three findings of fact are

accounts of what happened at MDT meetings based solely on documents produced at the

meetings (findings 4, 7 and 14). AR 7-8 & 11. Two findings of fact are accounts of S.S.' grades

based only on report cards in evidence (findings 6 and11). AR 8 & 10. One finding of fact

relates to a school suspension and is supported only by a document in evidence (finding 5). AR

8. Of all of these findings, only two make any mention of the witness testimony presented at the

hearing (finding 9 & 16, AR 9&11). If the Hearing Officer's were meant to make decisions

based solely on the documentary evidence there would be no need to convene due process

hearings which present testimony whose credibility is to be assessed by the Hearing Officer.

     A Hearing Officer is not at liberty to pick and choose the evidence which he would like

to address in the HOD. He is bound to fully convey the evidence presented on each issue, assess

credibility and then come to a legal conclusion. This Court should give minimal deference to the

HOD because it does not contain an assessment of the facts and opinions presented at the

hearing. It is not an accurate reflection of the case which the parent presented.

3.    The HOD should be given minimal weight because the Hearing Officer came to conclusions which were directly contrary to the evidence presented on the issues of S.S.' need for full time special education and failure to receive ESY services.

a.    The HOD contains patently wrong statements with regard to S.S.' need for a full time special education placement.

The third reason that the Court should only give minimal deference to the HOD is that it contains blatantly incorrect conclusions.  In their due process hearing request the parent asserted that "[iIn violation of the IDEIA and DMR, Howard Road Academy failed to provide an appropriate level and amount of special education services to the student."  AR 160.  One of the main arguments that the parent made at the due process hearing was that S.S. required a full time special education placement.

The parent presented the testimony of two witnesses on the matter and both clearly stated that S.S. required full time special education services.  During the hearing, Plaintiff asked witness Anne Warnke about this issue.

Q:    "Do you think [S.S.] would benefit from a fulltime special education program with, so that he was with other peers that had similar disabilities?

A:    At this point definitely, and the reason for that is the fact that he does need some intensive work on his reading and his language skills."

Transcript at 214.  Plaintiff's expert witness Dr. Wilding also testified that he needed a full time special education setting.  AR 571, quoted above at pages 13 and 16.

In direct contradiction to this record evidence, the Hearing Officer stated "[n]either Dr. White nor Dr. Wilding recommended a full-time special education placement" and that the Parent did not meet her burden of proof that S.S. required a full time special education

placement. AR 13. Not only has the Hearing Officer ignored record evidence, he went so far as to wrongly conclude that Dr. Wilding did not recommend a full time special education placement. The Court should not give deference to an HOD which contains such palpable misstatements of fact and conclusions of law.

Plaintiffs have shown by a preponderance of the evidence that the HOD is wrong and that this Court need not give it due deference. As illustrated through the above identified testimony, Plaintiffs established at the hearing that student S.S. should not have been receiving specialized instruction in the general education setting, especially in a classroom with over 30 students. Expert witness Dr. Wilding and Anne Warnke both testified that S.S. required a full time special education placement. HRA made a referral for S.S. to a full time out of general education placement and DCPS agreed to place and fund S.S. at a full time out of general education special education placement. The only person who found that S.S. did not need a full time special education placement was the Hearing Officer. Therefore, Plaintiffs are entitled to summary judgment because they have established by a preponderance of the evidence that HRA denied S.S. a FAPE by failing to provide him with an appropriate special education setting and intensity of services. To remedy these denials of FAPE, HRA should be ordered to fund compensatory education.

       b.     The HOD contains patently wrong statements with regard to extended school year ("ESY") services.

In her request for due process hearing the parent alleged that in "violation of the IDEIA and DCMR, Howard Road Academy failed to deliver ESY services to the student in violation of his IEP." AR 160. There is no dispute that S.S. was entitled to receive ESY services. Both the cover page of S.S.'s February 2007 IEP and the meeting notes indicate that he was to get ESY.

AR 225 & 236.  In her testimony, Tamika Shank stated that she was aware that S.S. was to get ESY services.  AR 493.  She specifically stated that she spoke to the school about the ESY and they told her that they did not have papers which indicated that S.S. was to get ESY.  AR 493-4. Despite this, S.S. did not get ESY during the summer of school year 2006-2007.  AR 11.  The parent clearly met her burden of proof that S.S. did not get ESY services.

HRA did not present any witness testimony of documentary evidence to rebut this presumption and in fact conceded the violation.  In her closing statement, counsel for HRA states, "**Howard Road Academy did admit that it forgot to submit the forms for ESY** this summer.  That was clearly a mistake.  Howard Road, you know, was supposed to provide that and didn't."  AR 809.

Amazingly, the Hearing Officer blatantly disregards the testimony and HRA's admission and states that the parent has "not met her burden of proving that HRA failed to offer ESY services to Petitioner in the summer of 2007."  AR 12.  In direct contradiction to the above quoted live testimony of the parent, the Hearing Officer stated that the Tamika Shank "did not testify that she ever called HRA to inquire about [S.S]' non-attendance in ESY."  AR 12.  This Court should give minimal deference to this HOD because it fails to accurately find violations of the IDEIA even when they are admitted by HRA themselves.

> B.    *Plaintiffs have established by a preponderance of the evidence that the Hearing Officer erred in his determination that S.S. was not denied a FAPE.*

Tamika Shank established at the due process hearing that HRA denied S.S. a FAPE by, among other things, failing to provide S.S. with an appropriate IEP, failing to assure that S.S. made adequate academic progress and failing to implement S.S.' IEP.

1.    <u>S.S. was denied a FAPE because his IEP was inappropriate; the IEP did not have appropriate goals and objectives.</u>

A preponderance of the evidence at the hearing establishes that HRA denied S.S. a FAPE because his IEP did not have appropriate goals and objectives.  The Supreme Court set forth the standard for determining whether a child is receiving a FAPE as requiring an analysis of whether the child has "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."  <u>Board of Education of the Hendrick Hudson Central School District, et al. v. Rowley</u>, 458 U.S. 176, 201 (1982).  To determine whether a FAPE has been provided, courts must determine whether the IEP "was reasonably calculated to enable the student to receive educational benefits."  <u>Jalloh v. D.C.</u>, 535 F. Supp.2d 13, *2 (D.D.C. 2008)(<i>citing</i> Loren F. v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1312 (11th Cir. 2003)(<i>see also</i> <u>Reid</u>, 401 F.3d 516, *518,  "the IEP must, at a minimum, 'provide personalized instruction with support services to permit the child to benefit educationally from that instruction.'")

The documentary and testimonial evidence established that the IEP developed and implemented by HRA's was inappropriate because it lacked goals and objectives in areas of S.S' disability.  Expert Dr. Wilding testified specifically about the goals and objectives on the February 2007 IEP.  AR 563-570.  She testified that the reading goals were not adequate because they did not address S.S.' documented and severe difficulties with decoding.  AR 563.  She also opined that other goals were too advanced for him.  AR 563-4, 565-6.  Speech and language pathologist Anne Warnke also testified about the goals and objectives in the February 2007 IEP.  AR 602-3.  She testified that she was "surprised that there was nothing on there about the decoding and the phonemic awareness for him."  AR 602.

26

HRA's own witnesses supported the parent's argument that S.S.' 2007 IEP had inappropriate goals and objectives.  Donna Johnson testified on cross examination that the goals and objectives on S.S.' IEP were not changing from year to year because he was not meeting them.  AR 649-650.  Special education teacher LaToya Jones-Davis testified that S.S. struggled with math word problems, but the IEP did not have any goals or objectives to address this.  AR 741-2.  She also conceded that S.S. had severe decoding problems causing him to function on the first or second grade level, but there were no IEP goals for decoding.  AR 742.

Clearly, an IEP which does not have goals and objectives in all areas of disability cannot be "reasonably calculated to enable the student to receive educational benefits."  There was ample testimony that S.S.' learning disability affected his ability to decode and his phonemic awareness and that he had difficulty with math word problems.  Despite this, his IEP did not have any goals and objectives in these areas.  Without these goals there is no way that his IEP was designed to "provide personalized instruction with support services to permit the child to benefit educationally from that instruction."  Thus, the parent presented sufficient evidence at the administrative due process hearing that HRA denied S.S. a FAPE by failing to provide him with an appropriate IEP.

2.    <u>S.S. was denied a FAPE because he failed to make adequate academic progress.</u>

The parent established by a preponderance of the evidence that HRA denied S.S.' a FAPE because he failed to make adequate academic progress.  A child is being provided with FAPE when he is able to make adequate academic progress.  <u>Board of Education of the Hendrick Hudson School District, et al. v. Rowley, et ux.</u>, 458 U.S. 176 (1982).  Case law provides that 'if the child is being educated in the regular classrooms of the public education system, [the IEP]

27

should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Reid, 401 F.3d at 519 (internal citations omitted).

The record shows that S.S. failed to make adequate academic progress at HRA. S.S.' fourth quarter report card from the 2006-2007 school year shows that he is getting an F in science, a D in mathematics and a D in "paragon". AR 24. Even though S.S. may have been promoted to a new grade each year, testing revealed that he was functioning well below age and grade level. Expert Dr. Wilding testified that S.S. was almost 13 years old when she evaluated him, but his reading and decoding skills were on the same level as an eight or nine year old. AR 543-547. She further testified that in the last two years, while he was at HRA., S.S. had not made academic progress in reading or writing. AR 553. His oral language skills decreased and he did not make any progress in his receptive language. AR 555-6. Many of S.S.' IEP goals and objectives did not change from year to year because he was not making progress on them. AR 649-650.

Counsel for the parent directly asked the expert witness, "can you say from your time that you spent with [S.S.] and the review of the records, can you say whether you think [S.S.] has been receiving appropriate special education at Howard Road Academy?" Dr. Wilding responded, "I don't' think he has...[B]ecause the progress – you know, I haven't seen the progress that I would expect." AR 574-5. Despite this clear testimony, the Hearing Officer found that S.S. benefitted from the special education at HRA. AR 13.

HRA witness testimony supports the conclusion that S.S. did not make adequate academic progress. HRA witness Donna Johnson conceded that S.S. was not making progress in the written language goals identified on his IEP. AR 649-50. Aside from mastering two of the

social emotional goals in his IEP, S.S. did not master any of the goals and objectives.  AR 660.

He did not master any of the communication goals.  AR 665.  She also admitted that a review of

his report cards shows that S.S. was not making academic progress.  AR 658.  HRA Special

education teacher LaToya Jones-Davis testified that S.S. was not making any progress on his

math goals. AR 740.  The Hearing Officer did not reflect on the evidence presented which

established that S.S.' had failed to make progress, the key measure under the IDEIA for

determining whether a student has received the required educational benefit.

The parent has established by a preponderance of the evidence that S.S. failed to make

adequate academic progress.  He was being education in the regular education classroom, but he

did not "achieve passing marks" and progress academically from grade to grade.  The evidence

shows that S.S.' report card was replete with Ds and F.  Academic testing revealed that this

thirteen year old was functioning on the same level as an eight or nine year old.  His teachers

reported that he was not progressing on the goals and objectives in his IEP.  HRA denied S.S. a

FAPE, as evidence by his clear failure to make academic progress.

3.   S.S. was denied a FAPE because HRA did not provide him with all of the
     services on his IEP .

The parent proved by a preponderance of the evidence that HRA denied S.S. a FAPE

because they failed to provide him with all of the services on his IEP.  The IDEIA requires that

at the beginning of the school year each local education agency have an IEP in effect for each

student in their jurisdiction who has been identified as a child with a disability.  20 USC

1414(d)(2)(A), 34 CFR 300.323(a).  In order to assure a FAPE, the LEA must implement all of

the requirements of the IEP.  "[A]ll of the IEP requirements in an IEP are significant, and

educators should strive to satisfy them."  <u>Catalan, et al. v. District of Columbia, et al.</u>, 478

F.Supp.2d 73, *75 (D.D.C. 2007).

To prevail on a claim that FAPE was denied because of a failure to implement an IEP "a

party challenging the implementation of an IEP must show more than a *de minimus* failure to

implement all elements of that IEP, and, must demonstrate that the school board or other

authorities failed to implement substantial or significant provisions of the IEP."  <u>Catalan</u> at *75

(*citing* <u>Houston Independent School District v. Bobby R.</u>, 200 F.3d 341, 349 (5th Cir. 2000)).  A

court "reviewing failure-to-implement claims under IDEA must ascertain whether the aspects of

the IEP that were not followed were 'substantial or significant,' or, in other words, whether the

deviations from the IEP's stated requirements were 'material.'" <u>Catalan</u>, 478 F.Supp.2d at *76

(*citations omitted*).

Tamika Shanks presented enough evidence at the due process hearing to show by a

preponderance of the evidence that the failure to provide S.S. with all of the services on his IEP

was substantial and significant.  Because he did not receive all of the hours of specialized

instruction and extended school year services ("ESY") on his IEP he was not able to get

meaningful educational benefit from his program.

        a.     In violation of the IDEIA, HRA did not deliver all of the hours of
               specialized instruction on S.S.' IEP.

The parent presented evidence that S.S. was not getting all of the all of his hours of

specialized instruction on his IEP.  As set forth fully in pages 19 through 21, because of the

number of students that she was serving and the amount of specialized instruction they were to

get, it is unclear how HRA could provide S.S. all of his services.

Plaintiffs have presented enough evidence for this Court to find that HRA's failure to implement the IEP constitutes a denial of FAPE. The failure to provide S.S. with all of the hours of specialized instruction on his IEP is both "substantial and significant." The parent presented ample evidence that S.S. required a full time special education program. Thus, even if S.S. had been receiving seventeen hours a week of specialized instruction a week it would not have been sufficient. Thus if HRA was not likely delivering all of the specialized instruction on S.S.' IEP, he was getting an even greater deprivation. The significant and substantial impact of this failure to implement is that S.S was not getting academic benefit. He was failing many subjects and testing revealed that he was functioning years behind his age and grade peers.

   b.  In violation of the IDEIA, HRA did not provide S.S. with the ESY services on his IEP.

S.S. has shown by a preponderance of the evidence that he was denied a FAPE because HRA failed to deliver the ESY services to which he was entitled. ESY services are special education and related services provided in accord with a child's IEP that are delivered beyond the normal school year. 34 CFR 300.106(b), 5 DCMR 3017. These extraordinary services are delivered when "it is shown that the student will suffer some significant regression of skills or knowledge without a summer program, followed by an insufficient recoupment of the same during the next school year." Reush v. Fountain, 872 F.Supp. 1421, *1433 (D. M.D.1994)(*citing* Cordrey v. Euckert, 917 F.2d at 1470 (6th Cir. Ohio 1990)).

There is no dispute that S.S. was entitled to receive ESY services for school year 2006-2007 but did not receive them. Both the cover page of S.S.'s February 2007 IEP and the meeting notes indicate that he was to get ESY. AR 225 & 236. The fact that HRA agreed to provide S.S. with these extraordinary services shows that they were aware that his learning disability was

seriously affecting him academically.  ESY services are traditionally provided only to students

with the most severe disabilities who will not be able to maintain basic skills without the

continuation of special education services over the summer.  In agreeing to include ESY on S.S.'

IEP, HRA agreed that S.S. was one of these students.  Tamika Shank confirmed that the school

discussed providing S.S. with ESY.  AR 493.  Defendants' conceded that they did not provide

S.S. with his ESY.  AR 809.

The failure to implement the ESY provision on S.S.' IEP was both "substantial and

significant."  The record is replete with evidence that S.S.' academic functioning was years

below his age and grade peers.  By agreeing to put ESY services on his February 2007 IEP, HRA

was agreeing that this student was at serious risk for regression and failure to recoup the skills in

a reasonable time.  HRA conceded that he needed these services and then, without justification,

failed to provide them.  It is clear that the failure to implement S.S.' ESY services was

substantial and significant and constitutes a denial of FAPE.  The Hearing Officer inexplicably

ignored HRA's admitted failure to deliver an essential IEP service.

C.    *The denial of FAPE can be remedied by ordering HRA to fund the compensatory*
      *education plan which was presented at the hearing.*

1.    Compensatory education is an appropriate remedy for a denial of FAPE.

Plaintiff is entitled to the compensatory education to remedy the denial of FAPE.  Her

August 17, 2007 due process hearing request spells out her specific allegations against HRA and

states that, among other things,  "compensatory education is requested for the denial of FAPE."

AR160-1.  At the hearing the parent submitted 33 exhibits and the live testimony of three

witnesses which all focused on establishing that HRA had denied S.S. a FAPE.  AR 157-158 &

396-617.  These arguments are presented above.  Strengthening her claim for compensatory

education is the fact that the violations that Plaintiff Tamika Shank alleged at the due process hearing were substantive, not procedural in nature.

As aptly summarized by this Court in its June 25, 2008 Memorandum Opinion and Order, what "is presently at stake in this litigation is whether S.S. was denied a FAPE while at HRA, and if so, whether he would benefit from compensatory education to remedy that past harm."  Memorandum Opinion and Order at 6 (June 25, 2008).   For the reasons set forth above, this Court should not defer to the HOD.  The parent has established by a preponderance of the evidence that the Hearing Officer erred in his determination.  The parent presented ample record and testimonial evidence at the due process hearing to establish that HRA denied S.S. a FAPE. To remedy this denial, HRA should be ordered to fund a compensatory education plan.

"Courts have always reasoned that purely prospective relief under the IDEA is not sufficient to address the needs of a disabled child.  The 'theory of compensatory education' rests on the belief that 'courts and hearing officers may award educational services . . . to be provided prospectively to compensate for a past deficient program.'" D.W., et al. v. District of Columbia, et al., 2008 U.S.Dist LEXIS 48074, *10 (D.D.C. 2008)(citing Reid, 401 F.3d at 522). Compensatory education is especially appropriate where the underlying denial of FAPE is the result of a substantive, not procedural, violation of the IDEA.  Id. at *14.

As recently opined by Chief Judge Lamberth, a "presently appropriate educational program does not abate the need for compensatory education."  D.W. at *10 (citing Flores ex rel. J.F. v. District of Columbia, 437 F. Supp.2d 22, 20 (D.D.C. 2006)).  Thus, the fact that S.S. is now in a full time special education placement for learning disabled students does not abate his need for compensatory education to remedy the denial of FAPE caused while he was a student at

HRA.  "A compensatory education award is an equitable remedy that 'should aim to place disabled children in the same position they would have occupied but for the school district's violation of the IDEA.'" <u>McLeod Bethune Day Academy Public Charter School v. Bland</u>, 2008 U.S.Dist. LEXIS 41096, * 4(D.D.C. 2008)(quoting <u>Reid v. D.C.</u>, 401 F.3d at 518 (D.C. Cir. 2005)).

Many Courts have also addressed how to determine the components of a compensatory education plan.  An award should be tailored to "correct the results of a school system's past violations and confer the educational benefits contemplated by proper implementation of the Act in the first instance." <u>Diatta v. District of Columbia</u>, 319 F.Supp. 2d 57, 66 (D.D.C. 2004). Compensatory education programs "are expected to yield tangible results, distinct from those conferred on the child by other programs: 'whereas ordinary IEPs need only provide 'some benefit,' compensatory awards must do more - they must *compensate*." <u>D.W.</u>, 2008 U.S.Dist LEXIS at *14 (citing <u>Reid</u>, 401 F.3d at 525)

In <u>Reid</u>, the U.S. Court of Appeals for the District of Columbia Circuit determined that a hearing officer, and then a U.S. District Court judge, erred in applying a mechanical standard to determined the appropriate amount of compensatory education, without any further explanation. <u>Reid</u>, 401 F.3d 516, 522 (D.C. 2005).  The Circuit Court rejected standards that awarded compensatory education on a basis of one hour for every day that FAPE was denied, and on a basis of one hour for every hour that FAPE was denied.  <u>Id</u>. at 523.  Instead, the Circuit panel endorsed a "flexible approach" that was "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.  <u>Id</u>. at 524.

34

2.    <u>The parent presented enough evidence to develop a compensatory education plan which would meet the Reid standard.</u>

At the due process hearing the parent established the denial of FAPE and what compensatory education services could remedy this denial.  Plaintiff's expert witness Dr. Wilding testified that S.S. had a reading disorder and a language based learning disorder which affected his ability to function in all academic classes.  AR 533-4, 541-2.  Her testing showed that S.S. was years behind his peers in his academic skills, reading skills, writing skills, oral language skills and receptive language skills.  AR 553, 555-6.

As S.S. has a reading disability and a language based learning disability, causing him to suffer in all academic areas, she recommended a compensatory education program which focuses on remediating these skills using individual tutoring and programs designed for students with similar disabilities.  Dr. Wilding opined that S.S. needed to have "support across all academic areas, because reading and writing are basic fundamentals for him to be able to function at school."  AR 551.  In addition to attending a school with a highly structured classroom setting with a low student to teacher ratio with students having similar difficulties with language, she made various academic programming suggestions.  AR 244, 560-1.  Dr. Wilding states that "[S.S.] needs individualized, systematic, daily reading instruction by a reading specialist."  AR 244.  She suggests some phonics-based approaches, such as Lindamood, Orton-Gillingham, or Wilson, that she feels would be effective with S.S.  AR 244.  She also identifies various software designed for home and school use, such as Earobics, SoundReading, Great Leaps and Reading SOS.  AR 244.

Importantly, HRA also realized that S.S. was suffering in academics and needed intense remediating.  In April 2007 HRA school psychologist Charla White conducted a psychological

35

evaluation of S.S.  AR 246-50.  In the report she found that S.S. was functioning below age and grade level in broad reading, math and spelling.  AR 249.  She recognized that his grades were dropping and this was likely due to the "increased demands of sixth grade in conjunction with skill deficits in core areas."  AR 249.  Her recommendations include that S.S. get "intensive remediating in a research based reading, writing, and math program to improve skills across core academic areas."  AR 249.

Plaintiff's witness Anne Warnke, a speech and language pathologist and the director of Accotink Academy, the full time special education school for students with learning disabilities which S.S. now attends, testified on the issue of compensatory education:

> Q:     Now if the hearing officer were to order that [S.S] were to get  – were to the – need to receive some compensatory education for the denial of FAPE, would you be able to provide him with compensatory services, number one, and number two, what do you think they should consist of?
>
> A:     Compensatory services, we could certainly do ESY, but that would be something I – he might need anyway, but we also have – we could provide tutoring that we don't do here at school, but we could provide names of different tutors that would be willing to see [S.S] or that we think that would be appropriate for him.
>
> Also there is [*sic*] many different types of computer programs and different things that we can also order for him that he would be able to use at home.  We have a lot of them here at school, but then they would be that continuation of what's going on at home and at school.
>
> And also again that something that we usually talk at the 30-day review that that [*sic*] the whole team is there, but there may be some things that they would want on the outside for him also to help him feel little bit better about himself in the self-esteem issue that he has and that's some kind of outside activity – with some sports activity or something.

AR 610-11.

Anne Warnke also testified about Accotink Academy's ability to implement some of the compensatory education suggestions made by Dr. Laura Wilding in her evaluation (AR 241-5).

> Q:    If you look at the second paragraph, she [Dr. Wilding] make [*sic*] some recommendations for some programs and some yeah, Lindamood-Bell, Orton-Gilingham, Wilson Programs, software for his home, daily reading instruction, phonics-based approaches, are those all things that you could either provide or help him to design a program at compensatory strategies for him?
>
> A:    Absolutely.  Though we use the Orton-Gillingham and the Wilson Program here at the school, and the [Earobics], we also have here at the school and various other computer programs that they have listed here, and Lindamood-Bell would also be another program that would be wonderful for him on the outside – as a comp for that issue.

AR 612-3.

Accordingly, the components of a compensatory education plan which the parent seeks, tutoring and computer software programs,[5] is individually tailored for him to "correct the results of a school system's past violations and confer the educational benefits contemplated by proper implementation of the Act in the first instance."

    3.    This Court has the authority to award compensatory education.

Since Plaintiffs have established (1) that the HOD should be given only minimal weight, (2) that HRA denied S.S. a FAPE, and (3) that the denial can be remedied by the grant of the compensatory education plan set forth by the Plaintiffs at the due process hearing, this Court should order HRA to fund compensatory education.  "The IDEA does not require the court to remand [a] case, instead authorizing the grant of 'such relief as the court determines appropriate.'" Wingfield, et al. v. District of Columbia, 2000 U.S.Dist. LEXIS 22737, *11

---

[5]Part of this compensatory education package would include the 100 hours of tutoring which the Defendants previously offered to fund.  AR 68-9.

(D.D.C. 2000)(*citing* 20 U.S.C. §1415(i)(2)(B)(iii)).  In <u>Wingfield</u>, the Honorable Judge Joyce

Hens Green of the United States District Court of the District of Columbia heard an appeal of an

HOD.  <u>Id</u>. at *1.  The only issue on appeal was whether or not the Hearing Officer erred in not

awarding additional compensatory education services.  <u>Id.</u> at *1-2.  Judge Green concluded that

the student was entitled to compensatory education and decided not to remand the case back to

the Hearing Officer.  She and that "[a]nything that might be gained from giving the hearing

officer an opportunity to address the matter with the benefit of a more complete record is

outweighed by the interest in swiftly resolving this matter so that [the student] may promptly

receive the compensatory special education services he is due."  <u>Id.</u> at *11.  Judge Green then

reviews the evidence presented and orders the school to fund a specific compensatory education

award.  <u>Id.</u> at *15.

    Plaintiff urges this Court to follow <u>Wingfield</u>, and review the extensive testimony and

documentary evidence and order HRA to fund a specific compensatory education award.  This

Court has ample authority to grant "such relief as the court determines appropriate" and

awarding relief would swiftly resolve the matter so that S.S. could finally get the compensatory

education services to which he is entitled for the multiple year denial of FAPE while he was at

HRA.

VI.    **Conclusion**

    Plaintiffs have demonstrated that there are no issues of material fact as to which there is a

genuine dispute, and that they are entitled to judgment as a matter of law.  Fed. R. Civ. Pro.

56(c), <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  This Court need only give minimal

deference to the HOD for three main reasons.  First, the hearing officer does not properly address

all of the properly plead and litigated issues.  The Hearing Officer did not address S.S.' need for small, self contained specialized instruction classes and the harm caused to him by delivering his specialized instruction in a large, general education classroom.  Nor does he address the parent's assertion that HRA was not implementing S.S.' IEP because they were failing to provide him with all of his specialized instruction.  Second, the Hearing Officer virtually ignored the live witness testimony presented by the parent, instead basing his HOD mainly on documentary evidence.  Finally, the Court should not defer to the HOD because the Hearing Officer came to conclusions which were directly contrary to the evidence presented on the issues of S.S.' need for full time special education and failure to receive ESY services.

Plaintiffs have established by a preponderance of the evidence that the Hearing Officer erred in his determination that S.S. was not denied a FAPE.  Plaintiff established that HRA denied S.S. a FAPE by failing to provide his with an appropriate IEP, failing to assure that he made adequate academic progress and failing to implement his IEP.  The denial of FAPE caused by these denials can be remedied by compensatory education.  Plaintiffs presented sufficient evidence at the hearing to establish what compensatory services would be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place" and this Court has the authority to award these services.

WHEREFORE, Plaintiffs respectfully request that this Court grant their Motion for Summary Judgment.

Respectfully Submitted,

   /s/ Donna Wulkan   
Donna L. Wulkan, Esq.

D.C. Bar Number 370961
1765 N Street, NW
Carriage House
Washington, DC 20036
202-682-3909 (phone)
202-955-1015 (fax)
Counsel for Plaintiffs

<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing document and its attachments were filed electronically on this 15th day of August 2008.  Thus, copies were served electronically on all parties on that day.

   /s/ Donna Wulkan
Donna L. Wulkan, Esq.
D.C. Bar Number 370961
1765 N Street, NW
Carriage House
Washington, DC 20036
202-682-3909 (phone)
202-955-1015 (fax)
Counsel for Plaintiffs

40

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **S.S.**, a minor by his mother and next friend  ) | |
| **TAMIKA SHANK**                                   ) | |
| ) | |
| and                                                ) | |
| ) | |
| **TAMIKA SHANK**                                   ) | |
| ) | |
| Plaintiffs,                          ) | |
| ) | |
| v.                                  ) | Civil Action No 1:08-cv-214 (ESH) |
| ) | |
| **HOWARD ROAD ACADEMY**                            ) | |
| ) | |
| and                                                ) | |
| ) | |
| **LATONYA HENDERSON** (officially as               ) | |
| C.A.O. Howard Road Academy)                        ) | |
| ) | |
| Defendants.                         ) | |
| _____) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO**
**WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Fed. R. Civ. P. Rule 56 and Rule LCvR 7(h), the Plaintiffs hereby submit the

following Statement of Material Facts as to Which There is No Genuine Issue:

1. Plaintiff S.S. is a thirteen year old boy, born September 5, 1994.  AR 162 & 159.

2. Plaintiff Tamika Shank is S.S.' mother.  AR 478.

3. Howard Road Academy Public Charter School ("HRA") is a charter school located in the

   District of Columbia.  AR 25.

4. HRA elected to serve as its own Local Education Agency ("LEA") for special education

   purposes.  AR 5 & 22.

5. S.S. began attending HRA when he was in the fourth grade.  AR 241

1

6.    S.S. remained a student at HRA through the seventh grade.  AR 80.

7.    S.S. has been diagnosed with a language based learning disability as well as a reading

       disorder.  AR 244, 249 & 259.

8.    S.S. also demonstrates delays in receptive and expressive language.  AR 256.

9.    Testing done when S.S. was in the sixth grade revealed that his sight word efficiency was

       equivalent to a third grader and his phonemic decoding efficiency was equivalent to a

       second grader.  AR 242.

10.   A speech and language evaluation done when S.S. was 12 years old revealed that his core

       language standard score was better than only 5% of his peers, his receptive language

       standard score was better than only 4% of his peers and his language memory score was

       better than only 3% of his peers.  AR 253.

11.   The entire time that S.S. was a student at HRA he had an individualized education plan

       ("IEP").  AR 207, 216, 255 & 372.

12.   During school year 2004-2005, when S.S. was in the 4th grade, his IEP was developed on

       January 11, 2005.  AR 207.

13.   S.S.' January 11, 2005 IEP identifies him as a student with a learning disability and

       provides that he is to receive 12 hours a week of specialized instruction and one hour a

       week of speech and language therapy.  AR 207.

14.   During school year 2005-2006, when S.S. was in the 5th grade, his IEP was developed on

       January 18, 2006.  AR 216.

15.  S.S.' January 18, 2006 IEP identifies him as a student with a learning disability and provides that he is to receive 12 hours a week of specialized instruction and one hour a week of speech and language therapy.  AR 216.

16.  The fourth quarter grades on S.S.' 5th grade report card are one A, one B, and three Cs.  AR 271.

17.  During school year 2006-2007, when S.S. was in the 6th grade, his IEP was developed on February 27, 2007.  AR 225.

18.  S.S.' February 2007 IEP identifies him as a student with a learning disability and provides that he is to receive 17 hours a week of specialized instruction, one hour a week of speech and language therapy and one hour a week of psychological counseling.  AR 225.

19.  S.S.' February 2007 IEP states that he is to receive extended school year ("ESY") services.  AR 225.

20.  The meeting notes from the February 2007 IEP state that the team recommended that S.S. receive ESY services.  AR 236

21.  S.S. did not receive the ESY services in the summer of 2007.  AR 494.

22.  The February 2007 IEP did not include goals and objectives that addressed S.S.' decoding issues.  AR 226-30, 563, 602 & 742.

23.  The February 2007 IEP did not have goals and objectives to addresses S.S.' math word problems issues.  AR 226-30, 741-2.

24.  The fourth quarter grades on S.S.' 7th grade report card are one C, one F, and two Ds.  AR 272.

25.    Charla White conducted a psychological evaluation of S.S. on April 11, 2007 and April 12, 2007.  AR 246.

26.    The April 2007 evaluation states that S.S.' skills in broad reading, math and spelling were in the low average and below grade and age expectations.  AR 249.

27.    The April 2007 evaluation also notes that the decline in S.S.' academic performance can be attributed to the increasing academic demands of sixth grade in conjunction with skill deficits in core areas.  AR 249.

28.    Dr. Laura Wilding conducted a psychological evaluation of S.S. on May 29, 2007, June 22, 2007 and July 20, 2007 when S.S. was 12 years old and in the 6th grade.  AR 241.

29.    Dr. Wilding's evaluation finds that S.S.' sight word efficiency was equivalent to a 3rd grader.  AR 242.

30.    Dr. Wilding's evaluation finds that S.S.' phonemic decoding efficiency was equivalent to a 2nd grader.  AR 242.

31.    Dr. Wilding diagnosed S.S. with a language based learning disability and a reading disability.  AR 244.

32.    On August 15, 2007 a multi-disciplinary team ("MDT") meeting was held at HRA.  AR 237.

33.    At the August 15, 2007 MDT meeting the team reviewed the April 2007 evaluation and Dr. Wilding's evaluation.  AR 237.

34.    On August 17, 2007, Tamika Shank filed a due process complaint requesting an administrative due process hearing.  AR 159-161.

35.    The due process complaint alleged that HRA had denied S.S. a FAPE under the IDEIA

by, among other things: failing to develop an appropriate IEP, failing to deliver all of the

services on his IEP, failing to ensure that he made adequate academic and emotional

progress, failing to provide the appropriate level and amount of special education

services, failing to deliver extended school year ("ESY") services and failing to provide

an appropriate special education services.  AR 160

36.    As relief for the denial of FAPE, Tamika Shank requested placement and funding for S.S.

at a full time special education placement and compensatory education services.  AR

160-161.

37.    On August 27, 2007, HRA convened an MDT meeting and changed the cover sheet of

S.S.' IEP to increase the number of hours of specialized instruction to 25 hours a week.

AR 371.

38.    On September 7, 2007 HRA mailed a referral packet containing the new IEP to DCPS.

AR 25.   The packet also contained a "Site Review Consideration Form" which stated

that he needed to be placed in an out of general education setting.  AR 26.

39.    On September 26, 2007 a resolution meeting was held.  The parent's attorney stated that

she believed S.S. had not made academic progress and had missed services and requested

compensatory education.  AR 67.

40.    The administrative due process hearing was held on October 23, 2007.  AR 396.  The

Hearing Officer presiding over the case was Terry Banks.  AR 399.

41.    At the hearing the parent moved into evidence 33 exhibits. AR 157-8.  Counsel for HRA

objected to Exhibits 21, 22 and 30 and the Hearing Officer sustained these objections.

AR 6 & 403-6.

42.    At the hearing, the parent presented the live witness testimony of three witnesses: mother

Tamika Shank, expert psychologist Dr. Laura Wilder, and Accotink school director and

speech and language pathologist Anne Warnke.  AR 477-504, 528-576 & 587-615.

43.    At the hearing, the parent cross examined HRA's witnesses.  AR 633-667, 687-705, 731-

746 & 757-778.

44.    S.S.'s general education classroom had almost 30 children.  AR 729.

45.    S.S. received special education services in the general education classroom.  AR 641-2.

46.    When delivering special education services in the general education classroom, the

special education teacher services multiple students, including S.S., at the same time.  AR

641 & 734.

47.    The expert witness testified that the delivery of services in an inclusion model has not

been successful for S.S. AR 571.

48.    HRA witness Donna Johnson testified that S.S. is opposed to receiving his special

education services in the general education classroom.  AR 683.

49.    HRA school psychologist Bridgette Nelson testified that the primary issue she and S.S.

addressed in therapy was his reluctance to get help in the general education classroom.

AR 751.

50.    Expert Dr. Wilding testified that being placed in a classroom with students who had the

same types of learning issues would help S.S.' emotional wellbeing.  AR 558 & 584.

51.    The expert witness testified that because of his learning disability, it would be difficult for S.S. to function in a class with over 30 students.  AR 539 & 560.

52.    Mother Tamika Shank testified that S.S. tells her that he does not understand what is happening in class.  AR 489.

53.    HRA speech and language pathologist Iva Alexander noted that as a result of his disability S.S. may have difficulty following directions in the classroom and participating in classroom activities.  AR 254.

54.    Expert Dr. Wilding testified that a teen who is struggling in school can have issues with low self esteem, sadness, depression and anxiety.  AR 566.

55.    Tamika Shank testified that when S.S. comes home from school with poor grades he starts to cry and does not want to go to school.  AR 494.

56.    Tools administered as part of Dr. Wilding's psychological assessment indicated that S.S. felt misunderstood, sad, disliked school and did not really care anymore.  AR 243.

57.    Dr. Wilding's evaluation indicated that S.S. was in the at risk range for hyperactivity, aggression, conduct problems, anxiety, depression, somatization, atypicality, withdrawal and attention problems.  AR 243.

58.    Dr. Wilding's evaluation states that S.S. will be most successful in a highly structured classroom with a low student to teacher ratio.  AR 244..

59.    Expert witness Dr. Laura Wilding testified that S.S. required a full time special education placement.  AR 571

60.    Accotink director and speech and language pathologist Anne Warnke testified that S.S. would benefit from a full time special education placement.  AR 214.

61.    The expert testified that S.S. should only be in a class with six to nine children.  AR 561.

62.    HRA witness Iva Alexander agreed that S.S. would benefit from a small, structured, language based classroom with curriculum designed for students functioning at the same grade level as S.S.  AR 705.

63.    On September 26, 2007, S.S. was accepted into Accotink Academy ("Accotink").  AR 277.

64.    Accotink is a full time special education placement for students with learning disabilities which has small classes.  AR 588 & 279.

65.    Tamika Shank testified that she called HRA about ESY services.  AR 493-4.

66.    HRA's own legal counsel admitted that HRA failed to provide S.S. with his ESY services.  AR 809.

67.    Expert witness Dr. Wilding testified that S.S. did not make academic progress in the last two years that he was at HRA in reading or writing.  AR 533.

68.    Expert witness Dr. Wilding testified that S.S.' oral language skills decreased and he did not make progress in receptive language.  AR 555-6.

69.    HRA witness Donna Johnson testified that S.S. did not make progress on the written language goals in his IEP.  AR 649-50.

70.    HRA witness Donna Johnson testified that S.S. did not master any of the communication goals on his IEP.  AR 665.

71.    HRA witness Donna Johnson testified that review of his report cards revealed that S.S. did not make academic progress.  AR 658.

72.    HRA witness LaToya Davis testified that S.S. did not make progress on his math goals. AR 740.

73.    Expert witness Dr. Wilding testified that S.S. had not made appropriate educational progress while at HRA.  AR 574-5.

74.    Anne Warnke testified on the issue of compensatory education.  AR 610.

75.    Anne Warnke testified that as compensatory education they could provide S.S. with ESY services, tutors or computer programs.  AR 611.

76.    Dr. Wilding's psychological evaluation contain information about compensatory education services.  She states that S.S. needed individualized, systematic, daily reading instruction by a reading specialist.  She further stated that research supports the use of a phonics based approach such as Lindamood, Orton-Gillingham or Wilson.  AR 244.

77.    The Hearing Officer's Determination ("HOD") was issued on November 5, 2007.  AR 3.

78.    The Hearing Officer concluded that the parent failed to meet her burden of proof on any of the issues and dismissed the case.  AR 3-12.

79.    The HOD does not contain any mention of the appropriateness of delivering S.S.' specialized instruction in an inclusion model.  AR 3-13.

80.    The HOD does not contain any mention of the appropriateness of delivering S.S.' specialized instruction in a classroom with almost 30 children. AR 3-13.

81.    The HOD states that Dr. Wilding did not testify that S.S. required a full time special education placement.  AR 13.

82.     The HOD states that the parent did not testify that she had called HRA to ask about ESY. AR 12.

83.     The HOD contains fifteen findings of fact but only makes one reference to the live witness testimony presented by the parent.  AR 6-11.

84.     On February 6, 2008 the parent filed a Complaint in the United States District Court for the District of Columbia appealing the HOD.  Complaint, dated February 6, 2008.

85.     On February 15, 2008, Accotink Academy renewed their acceptance of S.S. and agreed to accept him without pre-approved funding.  Amended Complaint ¶ 40.

86.     That same day the parent sent a letter to HRA and DCPS notifying them of S.S.' unilateral placement at Accotink and her intent to seek reimbursement for the placement. Amended Complaint ¶ 41.

87.     DCPS responded that they were willing to fund a full time special education placement for S.S. and agreed to fund him at Accotink Academy.  Amended Complaint ¶ 41.

88.     On February 20, 2008, DCPS issued a Notice of Placement for Accotink Academy and arranged for transportation services.  Amended Complaint ¶ 41 & 42.

89.     S.S. started Accotink Academy on February 27, 2008 and has been a student there since that time.  Amended Complaint ¶ 43.

90.     On March 19, 2008, Plaintiffs filed an Amended Complaint.  Amended Complaint, March 19, 2008.

                              Respectfully Submitted,

                               /s/ Donna Wulkan
                              Donna L. Wulkan, Esq.
                              D.C. Bar Number 370961
                              1765 N Street, NW

Carriage House
Washington, DC 20036
202-682-3909 (phone)
202-955-1015 (fax)
Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **S.S.**, a minor by his mother and next friend | ) | |
| **TAMIKA SHANK** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TAMIKA SHANK** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No 1:08-cv-214 (ESH) |
| | ) | |
| **HOWARD ROAD ACADEMY** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **LATONYA HENDERSON** (officially as | ) | |
| C.A.O. Howard Road Academy) | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Upon consideration of Plaintiffs' Motion for Summary Judgment, Defendants'

Opposition and Plaintiffs' Reply, as well as the record in this case, it is this _____ day of

_____, 2008, hereby

**ORDERED**, that Plaintiffs' Motion for Summary Judgment is **GRANTED**; and it is

further

**ORDERED**, that the November 5, 2007 Hearing Officer's Determination is reversed;

this Court finds that: Howard Road Academy Public Charter School denied S.S. a FAPE under

the IDEA, S.S. requires a full time special education placement for students with learning

disabilities, and S.S. requires compensatory education to remedy the denial of FAPE; and it is

further

**ORDERED**, that S.S. is awarded _____ hours of compensatory education in the form of

_____; and it is further

**ORDERED,** that HRA shall fund this award; and it is further

**ORDERED**, that HRA must reimburse Plaintiffs for reasonable attorneys' fees and costs

incurred in the litigation of the administrative due process hearing and the proceedings before

this Court.

_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:_____

Copies delivered on all parties electronically via ECF