**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
**S.S., a minor, by his mother and next friend,**   )
**TAMIKA SHANK,** *et al.*,                          )
)
      **Plaintiffs,**                    )
)
**v.**                                               )    **Civil Action No. 08-214 (ESH)**
)
**HOWARD ROAD ACADEMY,** *et al.*,                   )
)
      **Defendants.**                    )
_____ )

**<u>MEMORANDUM OPINION</u>**

Plaintiffs S.S., a minor child, and his mother, Tamika Shank, bring this action pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. § 1400 *et seq.*, alleging that defendants failed to provide S.S. with a free appropriate public education ("FAPE") while he was enrolled at Howard Road Academy ("HRA").  Before the Court are the parties' cross-motions for summary judgment.  For the reasons stated herein, the Court will grant both motions in part and remand the case to the hearing officer for further proceedings.

## I.    BACKGROUND

### A.    Statutory Framework

Congress enacted the IDEIA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  To accomplish this goal, the Act requires that for each child identified as eligible for special education, a team composed of the child's parents,

teachers, and other education specialists must develop an individualized education program

("IEP") that sets forth, among other things, the child's present levels of academic achievement

and performance, measurable annual goals and how progress toward those goals will be

measured, and special education and related services to be provided. *Id.* § 1414(d)(A)(i). A

parent who disagrees with the IEP or otherwise believes that his or her child has been denied a

FAPE is entitled to an impartial due process hearing. *Id.* § 1415(f)(1)(A). Any party aggrieved

by the hearing officer's decision may bring a civil action challenging it. *Id.* § 1415(i)(2)(A).

### B.      Factual Background

S.S. is a thirteen-year-old boy who has been diagnosed with a language-based learning

disability and a reading disorder. (Pls.' Stmt. of Material Facts [Pls.' Stmt.] ¶¶ 1, 7.) He

attended HRA from fourth grade through the first half of seventh grade. (Am. Compl. ¶ 10;

Defs.' Stmt. of Material Facts [Defs.' Stmt.] ¶ 2.)

*Fourth Grade, 2004-2005.* In January 2005, when S.S. was in fourth grade, an IEP was

developed for him, which classified him as a student with a learning disability and provided that

he was to receive 17 hours per week of specialized instruction and one hour per week of speech

and language therapy. (Administrative Record ("AR") at 207.) Education services were to be

provided in a combination general education setting and resource classroom. (AR at 215.)

In February 2005, Maureen Burnham, a speech-language pathologist contracted by HRA,

evaluated S.S. (*See* AR at 257-59.) Ms. Burnham concluded that S.S. was "exhibiting receptive

language disorder which is impacting his core language skills as well as his overall language

memory. However, his expressive language abilities appear to be a strength, and he is

functioning within one standard deviation from the mean with such tasks." (AR at 259.) Based

on the evaluation, Ms. Burnham recommended that S.S. continue speech/language therapy twice

a week for 30-minute sessions to address his receptive language deficits.  (AR at 259.)

In May 2005, Dr. Monica Blanton-Lacey conducted a comprehensive psycho-educational

evaluation of S.S., including administration of the Wechsler Intelligence Scale for Children –

Fourth Edition ("WISC-IV") and the Wechsler Individual Achievement Test – Second Edition

("WIAT-II").  (*See* AR at 145-55, 260-70.)  She concluded that:

> Within the area of achievement, [S.S.] demonstrated personal strength in Reading
> Comprehension on the WIAT-II.  On the Reading Comprehension subtest, [S.S.]
> demonstrated Average skills on tasks that assessed his capability to read sentences
> and paragraphs and answer questions about what was read.  Conversely, [S.S.]
> demonstrated relatively weak skills on the subtests of Math Reasoning and
> Pseudoword Decoding.  [S.S.] demonstrated Borderline skills on the Math
> Reasoning subtest, which consists of tasks that require him to understand number,
> consumer math concepts, geometric measurement, basic graphs, and solve one-
> step word problems.  On the Pseudoword Decoding subtest, a measure of one's
> ability to correctly apply phonetic decoding rules when reading a series of
> nonsense words, [S.S.] also demonstrated Borderline skills.  *[S.S.] does not meet
> the criteria for a formal diagnosis of a learning disability; however, [S.S.'s]
> performance in the aforementioned areas suggest[s] that he is in need of remedial
> services to assist him in improving his skills within these areas.*

(AR at 152, 267 (emphasis in original).)  While she offered a number of recommendations, Dr.

Blanton-Lacey did not recommend a full-time special education placement.  (*See* AR at 153-54,

268-69.)

*Fifth Grade, 2005-2006.*  During fifth grade, S.S. appears to have performed relatively

well.  Although the record does not contain grades for the first half of the year, during the second

half of the school year S.S. received average or above average grades.  Specifically, in the third

quarter S.S. received Cs in reading, language arts, science, mathematics, paragon, and spelling,

while in the fourth quarter he received an A in reading, Bs in language arts and spelling, and Cs in science, mathematics, and paragon.[1] (AR at 78, 271.)

An IEP was developed in the middle of the school year in January 2006. (AR at 118, 216.) The meeting to develop the IEP was attended by Donna Johnson, HRA's special education coordinator; LaToya Jones-Davis, S.S.'s special education teacher; Jennifer Brooks, S.S.'s speech pathologist; and S.S.'s father. (AR at 118, 127, 216.) At the meeting, Ms. Jones-Davis indicated that S.S. had "made steady progress in areas of reading, spelling and written language," and Ms. Brooks stated that he had made "steady progress" in speech therapy. (AR at 127.) Accordingly, the IEP team decided to reduce S.S.'s hours of specialized instruction from 17 to 12, but retained the one hour per week of speech therapy. (AR at 118, 128, 216.) The team also determined that extended school year services ("ESY") were unnecessary. (AR at 128-30.) The IEP indicated that education services were to be provided in a "general education [setting] with assistance," speech therapy was to take place outside the classroom, and S.S.'s level of need for services was deemed to be low. (AR at 122, 126, 223-24.) By the end of June 2006, S.S. was making progress on two of the three short-term objectives in support of his annual goal in reading, one of three objectives in support of his annual written language goal, and four of four objectives in support of his annual math goal.[2] (AR at 123-25, 219-22.) S.S. was suspended from school for three days in March of that school year for throwing soap on the restroom floor and in another student's hair. (AR at 206.)

---

[1] In the third quarter, S.S. also received a G in Spanish and Es in music, physical education, technology, and art. In the fourth quarter he received Gs in Spanish, technology, and art and Es in music and physical education. (AR at 271.) E stands for "excellent," and G stands for "good." (See AR at 273.)

[2] The IEP did not specify whether S.S. made any progress on the five objectives in support of his annual goal in the area of communication. (AR at 123, 219.)

*Sixth Grade, 2006-2007.*  During his sixth grade year, S.S. began to struggle academically.  His grades fell dramatically.  Specifically, in the first quarter, he received an F in reading/language arts, Ds in science and paragon, and a C in mathematics; in the second quarter, he received an F in reading/language arts, Ds in science and mathematics, and a C in paragon; in the third quarter, he received Ds in reading/language arts, science, and paragon and an F in mathematics; and in the fourth quarter, he received a C in reading/language arts, an F in science, and Ds in mathematics and paragon.[3]

S.S.'s IEP team, which included Ms. Johnson; Ms. Jones-Davis; Gayle Dinkins, S.S.'s language arts teacher; Iva Alexander, S.S.'s speech pathologist; his mother; and his two educational advocates, met in February 2007.  (AR at 97, 225.)  At their meeting, Ms. Dinkins reported that S.S. "tries hard," but his "comprehension is low [and] he has problems writing down information."  (AR at 107, 234.)  Moreover, Ms. Dinkins indicated that S.S. resisted individual assistance, and his mother stated that he would not let her help him with homework.  (AR at 107, 234.)  Therefore, the IEP team decided to increase the amount of S.S.'s specialized instruction back to 17 hours per week and add one hour per week of psychological counseling "to help him cope with what's going on in his life (at home)," while also retaining the one hour per week of speech therapy.  (AR at 97, 107, 109, 225, 234, 236.)  In addition, the team recommended ESY services during the summer and that various testing be done to identify the reasons for S.S.'s academic struggles.  (AR at 97, 108-10, 225, 233-36.)  The IEP described the placement as "general education with/services," with speech therapy and psychological counseling to take place outside the classroom, and S.S.'s level of need for services was deemed

---

[3] In the first quarter, S.S. also received an S in technology and an E in art; in the second quarter, he received an E in music and a G in technology; in the third quarter, he received an S in physical education; and in fourth quarter, he received an NW in Spanish.  (AR at 272.)  S stands for "satisfactory, and NW stands for "needs work."  (AR at 273.)

to be moderate.[4]  (AR at 105, 231.)   S.S.'s mother signed the IEP, thereby indicating her

agreement with its contents and her consent to its implementation.  (*See* AR at 97, 225.)  The IEP

indicates that S.S. had mastered two of the six short-term objectives in support of his annual

social-emotional goal by the end of May 2007, but does not otherwise indicate whether progress

was made on any of the other goals.[5]  (*See* AR at 99-104.)

In the months following the IEP meeting, several tests were done in an attempt to identify

the reasons for S.S.'s academic problems.  In March 2007, Iva Alexander, a speech-language

pathologist contracted by HRA, evaluated S.S. and found that he had deficits in receptive and

expressive language and vocabulary development.  (AR at 144, 256.)   Moreover, she determined

that S.S.'s most significant weaknesses were in the areas of "concepts and following directions"

and "recalling sentences," which led her to conclude that he might experience difficulties in

following directions orally and in curricular workbooks, in taking notes or writing messages, and

in his ability to remember spoken sentences of increasing complexity in meaning and structure.

(AR at 141, 254.)  Based on her findings, Ms. Alexander recommended that S.S. continue to

receive speech and language therapy for one hour per week with emphasis on "improving

auditory processing skills, improving critical thinking/listening skills, improving logic/reasoning

skills, and increasing receptive vocabulary."[6]  (AR at 144, 256.)

---

[4] Ms. Jones-Davis testified at the administrative hearing that she delivered S.S.'s special
education services within the regular classroom; in a small group setting either in the regular
classroom, special education resource room, or another setting such as the library; or one-on-one.
(*See* AR at 713, 720-21, 733-36, 746-47.)

[5] Ms. Johnson testified that the lack of a mastery date on the IEP indicates that S.S. failed to
master the objectives.  (AR at 660-61.)

[6] The record includes progress notes prepared by Ms. Alexander for regular and makeup speech
pathology sessions in April through June 2007.  For all three months, S.S. worked on the goal of
improving his receptive and expressive language skills by mastering certain specified objectives.
The notes reflect that S.S. performed tasks and was assigned homework designed to practice the

In April 2007, Charla White, a licensed clinical psychologist contracted by HRA, also administered tests, including the WISC-IV and the Woodcock Johnson-III Tests of Achievement ("WJ-III"), to determine the reasons for S.S.'s academic difficulties.  Dr. White observed that on tasks, S.S. "lacked persistence and gave up easily."  (AR at 247.)  Moreover, she found that S.S.'s overall cognitive abilities were in the low average range, his verbal comprehension was in the borderline range, his perceptual reasoning and working memory were in the average range, and his processing speed was in the low average range.  (AR at 247.)  Based on his performance on the WJ-III, Dr. White found that S.S.'s "skills in Broad Reading, Math, and Spelling were in the Low Average [range] and below grade and age expectations.  His ability to formulate sentences independently was an area of strength."  (AR at 249.)  She concluded that S.S.'s decline in academic performance "appears to be influenced by the following factors:  increased demands of sixth grade in conjunction with skill deficits in core areas, and lack of persistence."  (AR at 249.)

Plaintiffs hired another licensed clinical psychologist, Laura Wilding, who tested S.S. in three sessions in May, June, and July 2007.  (*See* AR at 241, 530.)  In her report, Dr. Wilding concluded that

> [S.S.] demonstrates poor phonemic awareness which impacts his ability to decode.  His sight word reading ability is relatively good which suggests that with rehearsal and contextual clues, he is able to recognize words.  However, with poor decoding ability and phonemic awareness, he will face challenges when required

identified objectives and that he met with some success.  (*See* AR at 133-38.)  Moreover, in April 2007, S.S. took the District of Columbia Comprehensive Assessment System ("DC-CAS") test for sixth grade students, which assessed his reading and mathematics proficiency.  S.S. performed at the "basic" level, which is above the "below basic" level and below the "proficient" and "advanced" levels.  (AR at 156.)  While the record does not include definitions of these performance levels, the District of Columbia Public Schools website states that the "basic" performance level indicates that the "[s]tudent shows some academic knowledge and skills.  This suggests a student is in need of academic assistance."  *See* http://www.k12.dc.us/offices/oda/doc/DCCAS_ Overview_Brochure_FINAL_March6.pdf.

> to decode unfamiliar words.  These results suggest diagnoses of a ***Language
> Based Learning Disability*** as well as a ***Reading Disorder***.

(AR at 244 (emphasis in original).)  Based on this diagnosis, Dr. Wilding concluded that "[S.S.]

will be most successful in a highly structured classroom with a low student-to-teacher ratio" and

that he "needs individualized, systematic, daily instruction by a reading specialist."  (AR at 244.)

Dr. Wilding provided a more detailed analysis in her October 23, 2007 testimony during

the administrative hearing.  Specifically, she explained that many of S.S.'s scores from the WJ-

III test that she had administered showed that he had significant difficulties in the areas of

reading and language.  Specifically, she testified that, although he was almost 13 years old at the

time she evaluated him, S.S.'s reading and decoding skills were equivalent to those of a child "8

or 9-ish" years old.  (AR at 547.)  Moreover, she indicated that his reading difficulties affected

his math scores such that his scores on basic calculation problems were in the average range,

while his scores on word problems were in the very low average range.  (AR at 550.)  When

comparing S.S.'s scores on the WJ-III test that she administered with those he received on the

WIAT-II in 2005, Dr. Wilding concluded that S.S. "hasn't made very much progress . . . in the

reading and writing areas" or in his receptive language skills, and that his oral language scores

had actually declined, although she indicated that he had shown improvement in math.  (AR at

552-53, 555-56.)  She also criticized the reading and written language goals set forth in S.S.'s

February 2007 IEP as inadequate and recommended that counseling goals be included in the IEP.

(*See* AR at 562-67.)  Moreover, Dr. Wilding testified that S.S. required a self-contained, full-

time special education setting because

> he has shown that it's not possible for him to interact and learn in a setting as
> large as the setting that he is in right now.  And he is going to need to get services
> where all the other children are getting services as well.  And that is . . . what a
> self-contained setting would do for him.  It would provide him with the needed
> services in an environment that's going to be a low kind of stimulation

environment, few kids, enough support, and just constantly reinforcing all of the skills that . . . they need him to learn throughout every class that he is in.

(AR at 571-72.)

*Summer 2007*.  On August 15, 2007, S.S.'s IEP team met to review the evaluations administered by Ms. Alexander and Drs. White and Wilding.[7]  At that meeting, S.S.'s mother expressed concern about his lack of progress in speech and academics.  Accordingly, she requested that HRA inform the District of Columbia Public Schools ("DCPS") that it could not appropriately service S.S. and that he should be referred to DCPS for a full-time special education placement.  (AR at 94, 238.)  HRA refused.  Therefore, on August 17, 2007, Mrs. Shank requested a due process hearing, citing HRA's failure to develop an appropriate IEP, ensure that S.S. made academic and emotional progress, provide an appropriate level and amount of special education services, deliver ESY services to S.S. in violation of his IEP, and provide an appropriate special education placement.  (*See* AR at 160.)  As relief, Mrs. Shank requested a new placement that would provide full-time special education and appropriate related services, funding for the new placement, and compensatory education.  (*See* AR at 160-61.)

Ten days later, on August 27, 2007, the IEP team met again.  At that meeting, S.S.'s IEP was changed to increase his hours of specialized instruction from 17 to 25, thereby giving him a full-time placement.  The meeting notes indicate that "[f]ull time setting is at the request of the parent.  Howard Road did not determine that [S.S.] needed a full time placement."  (AR at 79, 239.)  On September 7, 2007, HRA referred the request for full-time placement to DCPS.  (Pls.' Stmt. ¶ 38; Defs.' Stmt. ¶ 17.)

---

[7] The team included HRA employees Ms. Johnson; Ms. Alexander; Ms. Jones-Davis; Bridgette Nelson, the school psychologist; Angela Dantzler-Hill, S.S.'s science teacher; and the school attorney, as well as Mrs. Shank, a law clerk from her attorney's office, and other representatives of S.S.  (AR at 93, 237.)

*Administrative Due Process Hearing and Subsequent Placement*.  The due process hearing was held on October 23, 2007.  (Pls.' Stmt. ¶ 40; Defs.' Stmt. ¶ 19.)  On November 5, 2007, the hearing officer issued his decision finding that plaintiffs had failed to meet their burden of proof on any of the issues presented and dismissing the case.  (*See* Pls.' Stmt. ¶¶ 77-78; Defs.' Stmt. ¶¶ 37-38; AR 11-13.)

On February 15, 2008, Mrs. Shank sent letters to HRA and DCPS notifying them of her intent to unilaterally place S.S. at Accotink Academy and to seek reimbursement and funding for the placement.  (Pls.' Stmt. ¶ 86.)  In response, DCPS agreed to fund the placement, and on February 20, 2008, DCPS issued a Notice of Placement for Accotink Academy, and S.S. began attending school there on February 27, 2008.  (Pls.' Stmt. ¶¶ 87-89.)  Accordingly, the only issue before this Court is whether HRA denied S.S. a FAPE, thereby entitling him to compensatory education for the 2005-2006 and 2006-2007 school years.[8]

## II.     STANDARD OF REVIEW

In reviewing an administrative determination under the IDEIA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The reviewing court must give "due weight" to the hearing officer's determinations and may not substitute its own notions of sound educational policy for those of the school authorities.  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).  Nevertheless, less deference is appropriate than is the case in typical administrative proceedings.  *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)

---

[8] Plaintiffs focus on those years because the IDEIA has a two-year statute of limitations.  *See* 20 U.S.C. § 14159b)(6)(B) (limiting administrative complaints to violations that occurred not more than two years before the date the parent knew or should have known of them).  Moreover, the hearing officer considered only whether HRA had violated the Act as of the date of plaintiffs' hearing request.  (*See* Hearing Officer's Decision, AR at 13 n.31.)

("*Kerkam I*").  Where, as here, neither party seeks to present additional evidence, a motion for summary judgment "operates as a motion for judgment based on the evidence comprising the record."  *Jenkins v. District of Columbia*, No. 02-1055, 2005 U.S. Dist. LEXIS 34002, at *4 (D.D.C. Dec. 16, 2005).  The party challenging the administrative decision bears the burden of persuading the court to set aside the decision.  *Kerkam I*, 862 F.2d at 887.

## III.    ANALYSIS

### A.        This Case is Not Moot

As an initial matter, the Court rejects defendants' claim that plaintiffs' case is moot because S.S. is now receiving full-time special education at Accotink Academy.  (*See* Defs.' Opp'n & Cross-Mot. for Summ. J. ["Defs.' Mot."] at 12-14.)  As the Court explained when it denied defendants' prior motion to dismiss, plaintiffs' request for compensatory education to remedy the alleged denial of FAPE for the final two years S.S. was enrolled at HRA is a "request for equitable relief to remedy past harm [that] was not resolved by DCPS's decision to fund S.S.'s placement at Accotink Academy and therefore presents this Court with a live controversy to resolve."  *S.S. v. Howard Road Academy*, 562 F. Supp. 2d 126, 130 (D.D.C. 2008).  The Court also rejects as inconsistent with the record defendants' claim that plaintiffs have failed to demonstrate S.S.'s need for compensatory education.  Plaintiffs presented evidence of S.S.'s academic deficits and how they could be addressed.  (*See* AR at 241-44, 533-70.)  Therefore, should the Court determine that the hearing officer erred in his determination that S.S. was not denied a FAPE, the Court may rely on this evidence or, if necessary, take additional evidence or remand to the hearing officer for that purpose.  *See Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005).

B.      **Alleged Errors in Hearing Officer's Decision**

Plaintiffs raise a number of challenges to the hearing officer's decision, contending that it deserves minimal deference due to numerous errors and omissions.  The Court will consider each of these allegations in turn.

1.      **Appropriateness of General Education Classroom, Need for Full-Time Special Education, and Failure to Receive ESY Services**

Plaintiffs allege that the hearing officer's decision (a) failed to address their argument that S.S.'s IEP was inappropriate because it called for the delivery of services in a general education classroom with almost 30 children and (b) came to conclusions that were contrary to the evidence regarding S.S.'s need for full-time special education and failure to receive ESY services.  (*See* Pls.' Mot. for Summ. J. ["Pls.' Mot."] at 12-19, 23-25.)

With respect to S.S.'s IEP and placement, the hearing officer found that "neither the appropriateness of the IEP or placement was at issue as late as the MDT meeting on February 27, 2007."  (AR at 12.)  Accordingly, in addressing this issue, the hearing officer focused on events that took place after that meeting, noting that, since that time, S.S. had received poor grades in June 2007 and underwent psycho-educational evaluations by Drs. White and Wilding.  (AR at 12-13.)   Focusing on those evaluations, the hearing officer found that:

> Petitioner offered no proof that HRA was incapable of providing the services recommended by Drs. White and Wilding.  Neither Dr. White nor Dr. Wilding recommended a full-time special education placement.  The reasons for Petitioner's poor academic performance do not necessarily implicate the placement.  The Meeting Notes and testimony suggest that Petitioner's home is not conducive to doing homework.  He was absent for over one-sixth of the 2006-2007 school year.  Dr. White observed a lack of persistence that was confirmed by the report of his homeroom teacher at the August 15th MDT meeting.  Moreover, Petitioner's academic progress during the 2005-2006 school year, the proactive measures adopted at the February 2007 MDT meeting, and the fact that Petitioner's parents were satisfied with HRA for the first three and one-half of Petitioner's four years there suggests that Petitioner can derive educational benefit at HRA.

(AR at 13 (footnotes omitted).)

Thus, contrary to plaintiffs' contentions, the hearing officer did specifically address their claim that the general education setting specified in S.S.'s IEP was inappropriate for he required a full-time special education setting.  However, several of the hearing officer's statements are contrary to the record.  First, as plaintiffs point out, Dr. Wilding did testify that S.S. required a self-contained, full-time special education setting.  (*See* AR at 571-72.)  Similarly, Anne Warnke, the assistant educational director of Accotink Academy, testified that plaintiff would benefit from a full-time special education program.  (AR at 609.)  Moreover, S.S. was absent 19 days of the 2006-2007 school year, far less than the one-sixth of the year found by the hearing officer.[9]  (*See* Pls.' Reply at 9; AR at 272.)

The hearing officer similarly misstated the evidence regarding S.S.'s failure to receive ESY services during the summer of 2007, finding that:

> Although Petitioner's IEP prescribes ESY, his mother testified that Petitioner did not attend ESY during the summer of 2007.  However, Petitioner's mother offered no testimony as to the reason for Petitioner's failure to attend ESY.  She did not testify that she enrolled Petitioner in ESY or that HRA declined his enrollment.  Petitioner's mother did not testify that she ever called HRA to inquire about Petitioner's non-attendance in ESY.

(AR at 12.)  However, Mrs. Shank testified that she was aware, based on the February 2007 IEP meeting, that S.S. was supposed to receive ESY services and that she had spoken to someone at HRA about ESY services for summer 2007 and was told that the school did not have any paperwork indicating that he was supposed to attend.  (AR at 493-94.)  Moreover, counsel for HRA conceded during her closing statement that "Howard Road did admit that it forgot to submit the forms for ESY this summer.  That was clearly a mistake.  Howard Road, you know,

---

[9] While plaintiffs also dispute the hearing officer's statements regarding S.S.'s lack of persistence and home environment, the Court notes that these findings do have some support in the record.  (*See* AR at 249, 753-55, 778-79.)

was supposed to provide that and didn't . . . ."  (AR at 809.)  Thus, the record clearly establishes

that HRA failed to deliver ESY services to S.S. in the summer of 2007 as required by his IEP.

Because of these errors, the Court finds that the hearing officer's conclusions deserve

little deference.  Accordingly, the Court reviews the evidence in order to grant appropriate relief.

*See* 20 U.S.C. § 1415(i)(2)(C).  "Because the court's review must be 'independent,' and based on

a preponderance of the evidence, . . . the court's focus is not simply on whether the hearing

officer erred, but rather, more broadly, whether the child involved is receiving the free

appropriate public education mandated in the IDEA."[10]  *Gellert v. D.C. Pub. Schs.*, 435 F. Supp.

2d 18, 25 (D.D.C. 2006) (citations omitted).  In assessing whether a FAPE has been provided, a

court must determine whether (1) the school complied with the IDEIA's procedures; and (2) the

IEP developed through those procedures was reasonably calculated to enable the student to

receive educational benefits.  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982); *Jalloh v.

District of Columbia*, 535 F. Supp. 2d 13, 16 (D.D.C. 2008).  In considering the substantive

validity of an IEP pursuant to the second part of this test, a number of circuits have held that a

court must judge prospectively.

> [B]ecause the question . . . is not whether the IEP will guarantee some educational
> benefit, but whether it is reasonably calculated to do so, . . . the measure and
> adequacy of an IEP can only be determined as of the time it is offered to the
> student. . . .  Neither the statute nor reason countenance 'Monday Morning
> Quarterbacking' in evaluating the appropriateness of a child's placement.

*Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1149 (10th Cir. 2008) (internal quotation

marks and citation omitted).  *See also Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)

("We do not judge an [Individual Family Service Plan for a disabled preschool child] in

hindsight; rather, we look to the IFSP's goals and goal achieving methods at the time the plan

---

[10] The Individuals with Disabilities Education Act ("IDEA") was amended by the IDEIA.  *See*
Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 1, 118
Stat. 2647.

was implemented . . . ."); *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 530 (3d Cir. 1995) ("[A]ppropriateness is judged prospectively so that any lack of progress under a particular IEP . . . does not render that IEP inappropriate."); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990) ("[A]ctions of school systems cannot . . . be judged exclusively in hindsight. An IEP is a snapshot, not a retrospective.  In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated."); *cf. D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 599 (2d Cir. 2005) (noting that the Second Circuit had not decided if it was error to consider retrospective evidence in assessing the substantive validity of an IEP and remanding case to district court to assess the merits of the issue in the first instance).

Thus, instead of asking whether the February 2007 IEP was adequate in light of S.S.'s subsequent progress, the Court must ask whether the IEP was appropriately designed and implemented so as to convey a meaningful benefit to S.S.[11]  *Adams*, 195 F.3d at 1149.  When judged from this perspective, the IEP was adequate.  During his fifth grade year, S.S.'s grades reflected that he was progressing.  His special education teacher stated during the mid-year IEP meeting that he had made "steady progress" in reading, spelling, and written language.  His speech pathologist indicated that he was making "steady progress."  His January 2006 IEP reflected that he was making progress on a number of his short-term objectives.  Based on these factors, his IEP team decided that his hours of specialized instruction could be reduced.  The record does not reflect any dissatisfaction with S.S.'s IEP or placement at that time.

---

[11] Nevertheless, the Court notes that the changes in S.S.'s IEP appear to have provided some benefit in reading and language arts, areas of particular difficulty for S.S., since his grade in reading/language arts climbed from an "F" in the first quarter of the sixth grade year to a "C" by the final quarter.  In addition, S.S.'s February 2007 IEP reflected progress on two of six social-emotional short-term objectives, and Ms. Nelson, the school psychologist, testified that S.S. made progress on taking responsibility and being accountable for his work.  (AR at 779.)

When S.S. began to exhibit academic and emotional difficulties in the sixth grade, the IEP team responded by increasing his hours of specialized instruction back to 17 hours per week and adding one hour per week of psychological counseling.  The team also decided that a number of tests should be done to determine the reason for his drop in grades.  The Court cannot say that these responses were inappropriate at the time they were taken or that school officials should have realized at that time that S.S. required that all of his specialized instruction take place in a self-contained special education classroom.[12]  While in hindsight the criticisms of HRA's response by plaintiffs' expert Dr. Wilding may appear reasonable, Dr. Wilding did not complete her testing until the summer following S.S.'s sixth grade year.  Likewise, Dr. White and Ms. Alexander performed their testing near the end of S.S.'s sixth grade year, and the IEP team did not meet to review any of these evaluations until the summer after the February 2007 IEP had been developed and implemented.

Moreover, as plaintiffs point out, Ms. Alexander testified that S.S. would "benefit from a small, structured, language-based classroom where the curriculum was designed for children who were reading and functioning at the same grade level that he is."  (AR at 705.)  But she also indicated that every child she works with would benefit from such a classroom.  (AR at 705-06.)  The IDEIA, however, "establishes a 'basic floor of opportunity'; it does not require that a school provide the very best educational experience."  *Schoenbach v. District of Columbia*, No. 05-1591, 2006 U.S. Dist. LEXIS 38667, at *21 (D.D.C. June 12, 2006) (citing *Rowley*, 458 U.S. at 201).  Accordingly, the Court concludes that plaintiffs have failed to establish by a

---

[12] The Court notes that Ms. Jones-Davis testified that she delivered S.S.'s special education services in various settings depending upon his assessed need, including within the regular classroom; in a small group setting in the regular classroom, special resource room, or another setting; or one-on-one.  (*See* AR at 713, 720-21, 733-36, 746-47.)

preponderance of the evidence that S.S.'s IEP or his placement was inappropriate due to the failure to provide for a full-time special education placement.

However, plaintiffs did establish that HRA failed to provide S.S. with ESY services during the summer of 2007, as called for in his IEP. While the question of what standard to apply to failure-to-implement claims under the IDEIA has not been addressed by the D.C. Circuit, "the consensus approach to this question among federal courts that have addressed it has been to adopt a standard articulated by the Fifth Circuit" in *Houston Independent School District v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000). *Catalan ex rel. E.C.  v. District of Columbia*, 478 F. Supp. 2d 73, 75 (D.D.C. 2007), *aff'd sub nom. E.C. v. District of Columbia*, No. 07-7070, 2007 U.S. App. LEXIS 21928 (D.C. Cir. Sept. 11, 2007).  In *Bobby R.*, the court held:

> [T]o prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP.  This approach affords local agencies some flexibility in implementing IEP's, but it still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.

200 F.3d at 349; *see also Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) ("[A] *material* failure to implement an IEP violates the IDEA.  A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and [those] required by the child's IEP.").  Thus, the Court must determine whether the ESY services mandated by S.S.'s IEP were "substantial or significant" or, in other words, whether HRA's failure to deliver those services was "material."

S.S.'s February 2007 IEP contained an Addendum for ESY Services, which included a checklist with various statements followed by "yes" and "no" boxes to indicate whether the IEP team found the statements to be true or false.  On this checklist, the team responded "no" to the

statement, "All or most IEP goals and objectives are being achieved."  (AR at 110, 233.)  The

team responded "yes' to following statements:

- IEP is appropriate and reasonable for the student.
- Severity of student's disability requires individualized programming in areas of:  Reading, Math, Written instructions.
- Student record shows serious regression following interruptions in the school program.
- Student record shows inability to recoup skills a reasonable time following regression.
- Student has critical need for continuity in programming to facilitate achieving educational benefit from her or his educational program.
- After review the IEP team RECOMMENDS the provision of an extended school year program for the above student.

(AR at 110, 233.)  The reason given for the recommendation of ESY services was that "[S.S.]

has shown a decrease in grades which causes team to look at ESY."[13]  (AR at 110, 233.)  S.S.'s

parent signed the Addendum.  (AR at 111.)

Accordingly, the IEP team acknowledged that due to prior "serious regression" following

periods of school closure, S.S. had a "critical need" for program continuity in order to "facilitate

achieving educational benefit."  (AR at 110, 233.)  Given this acknowledgment based,

presumably, on the team's awareness of S.S.'s poor academic performance during sixth grade

following a summer in which ESY services had been deemed unnecessary, the Court concludes

that the failure to provide S.S. with ESY services during the summer of 2007 constituted a

material failure to implement his IEP.  *See* 34 C.F.R. § 300.106(a), (b) (requiring ESY services

to be provided where a child's IEP team determines that the services are necessary for the

provision of a FAPE); *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 537-38 (4th Cir.

2002) ("ESY Services are only necessary to a FAPE when the benefits a disabled child gains

during a regular school year will be significantly jeopardized if he is not provided with an

---

[13] No goals or objectives or special education services for ESY were specified.  (AR at 111.)

educational program during the summer months.")  The Court will address the remedy for this failure in subsection D below.

### 2.        Failure to Deliver All Hours of Specialized Instruction

Plaintiffs also contend that the hearing officer's decision should be given minimal weight because he did not address their argument that HRA failed to implement S.S.'s IEP by failing to deliver the required number of hours of specialized instruction called for by the IEP.  (Pls.' Mot. at 19-21.)  They also argue that S.S. was denied a FAPE by HRA's failure to provide this instruction.  (Pls.' Mot. at 30-31.)  Plaintiffs are correct that the hearing officer did not address this issue.  However, after reviewing the record, the Court finds that plaintiffs have not established that HRA failed to implement the required hours of instruction.

To support their argument, plaintiffs rely primarily on Ms. Jones-Davis' testimony that she served six special education students, with S.S. receiving 17 hours per week of specialized instruction and each of the other students receiving between five and ten hours of specialized instruction per week.  (AR at 731-32.)  From this testimony, plaintiffs calculated that Ms. Jones-Davis averaged about eight hours per week of instruction to the five other students in addition to the 17 hours per week of instruction she delivered to S.S.  They therefore contend that Ms. Jones-Davis was not credible because she could not have been delivering 57 hours of special education each week.  (Pls.' Mot. at 20.)  This assumption, however, presumes that each student received individualized instruction.  In fact, Ms. Jones-Davis testified that she sometimes provided group instruction.  (*See* AR at 733-35.)  Given this fact, the Court concludes that plaintiffs have not shown, by a preponderance of the evidence, that HRA failed to deliver all of S.S.'s hours of specialized instruction.

### 3.     Live Testimony

Plaintiffs next assert that the hearing officer's decision should be given minimal weight because he ignored most of their live testimony; therefore, they conclude, the decision is not an accurate reflection of the case they presented.  (*See* Pls.' Mot. at 22.)  Plaintiffs, however, do not specifically identify the testimony that should have been considered.  Much of the testimony in this case concerned documentary evidence.  For example, Dr. Wilding's testimony related primarily to the results of her evaluation of S.S. and her recommendations, much of which was contained in her written report.  She also commented on evaluations completed by contract examiners for HRA, which were also contained in written reports.  In addition, much of plaintiffs' cross-examination of witnesses involved discussion of information contained in written documents.  (*See, e.g.*, AR at 644-66 (cross-examination of Ms. Johnson regarding S.S.'s January 2006 and February 2007 IEPs and report cards); AR at 693-702 (cross-examination of Ms. Alexander regarding communication goals in February 2007 IEP, speech-language progress notes, and March 2007 evaluation); AR at 738-42 (cross-examination of Ms. Jones-Davis regarding math, written language, and reading goals in January 2006 and February 2007 IEPs); AR at 759-72 (cross-examination of Ms. Nelson regarding August 15, 2007 IEP meeting notes and social-emotional goals in February 2007 IEP).)

Moreover, the hearing officer addressed Mrs. Shank's testimony regarding HRA's failure to provide transportation to S.S. and HRA's testimony in response, Mrs. Shank's testimony regarding HRA's failure to provide S.S.'s speech and language therapy during a portion of sixth grade and Ms. Alexander's testimony regarding makeup sessions, and Mrs. Shank's testimony about HRA's failure to provide ESY services during the summer of 2007.  (AR at 9, 11-12.) While the hearing officer did not refer to the testimony of Anne Warnke, the assistant

educational director of Accotink Academy, this is hardly surprising since Ms. Warnke did not

evaluate S.S. or have any direct involvement in his classroom performance while at HRA.  In

addition, because the hearing officer determined that HRA provided S.S. with a FAPE, Accotink

Academy's services were irrelevant.  Absent plaintiffs' identification of testimony that the

hearing officer failed to consider and an explanation of how that testimony was important to their

case, the Court cannot conclude that the hearing officer's failure to refer to additional testimony

in his decision prejudiced plaintiffs.

> **C.      Other Alleged Denials of a FAPE**

> **1.      IEP Goals and Objectives**

Plaintiffs also contend that HRA denied S.S. a FAPE  because his February 2007 IEP did

not have goals and objectives that addressed his difficulties with decoding and phonemic

awareness and math word problems and contained reading and written language goals that were

too advanced.  (AR at 26-27.)  The IEP is a written statement that provides the basic plan and

goals for the student's education over the academic year.  *See* 20 U.S.C. § 1414(d)(1)(A)(i).  It

must include, among other things

> a statement of measurable annual goals, including academic and functional goals,
> designed to –
>
> (aa) meet the child's needs that result from the child's disability to enable the
> child to be involved in and make progress in the general education curriculum;
> and
>
> (bb) meet each of the child's other educational needs that result from the child's
> disability;

*Id.* § 1414(d)(1)(A)(i)(II).  Consistent with these requirements, S.S.'s February 2007 IEP

contained annual goals in the areas of reading, written language, mathematics, communication,

and social-emotional well-being, corresponding to each of the areas identified in his IEP as areas

requiring specialized instruction and related services.  (*See* AR at 99-105, 227-31.)  Each of these

annual goals was supported by various short-term objectives, the mastery of which would help

S.S. achieve the corresponding annual goal.  (*See* AR at 99-104, 227-30.)  The annual goals met

the requirements of the IDEIA.  The Court cannot say that the IEP was not reasonably calculated

to enable S.S. to derive educational benefit because it failed to provide more specificity with

respect to the reading, written language, and mathematics goals or to provide additional short-

term objectives in these areas.[14]

Significantly, S.S. made progress under his prior IEP in fifth grade on similar reading,

written language, and mathematics goals, even though goals or objectives addressing decoding,

phonemic awareness and word problems were not included.  Moreover, Ms. Jones-Davis

testified that she worked with S.S. on decoding, using a decoding reading program called

"Reading Rods," which "was designed to increase the child's reading comprehension, decoding

skills, and coding skills, spelling skills . . . ."  (AR at 717.)  She also testified that she helped S.S.

with phonetics-based reading, using a computer program that required S.S. to differentiate

between long and short vowel sounds. (AR at 718-19.)  Thus, even though not identified as goals

or objectives in his IEP, there is evidence in the record that S.S. received instruction to address

his difficulties in decoding and phonemic awareness.  In addition, as Dr. Wilding testified, S.S.'s

low-average performance on word problems was due to his reading and language-based

deficiencies.  (*See* AR at 550-51, including testimony that "[S.S.] is going to need support across

---

[14] The goals identified in the IEP are general (*e.g.*, "[S.S.] will improve reading comprehension
and reading fluency with 80% accuracy;" "Student will improve written language skills with
80% accuracy;" "Student will improve math skills with 80% accuracy"), while the short-term
objectives are more specific.  Accordingly, goals aimed at improving S.S.'s decoding ability and
phonemic awareness, had they been included in his IEP, could have been included either as part
of the general goal in reading and/or written language or as short-term objectives in support of
his reading and/or written language goals.   Similarly, a goal aimed at improving S.S.'s ability to
solve word problems could have been included as part of the general goal in mathematics or as a
short-term objective in support of his mathematics goal.

all academic areas, because reading and writing are the basic fundamentals for him to be able to

function at school.")  Thus, S.S.'s performance on math word problems would be expected to

improve as his reading comprehension improved without the need for a specific goal or objective

targeting word problems.  For these reasons, the Court concludes that S.S.'s February 2007 IEP

was not required to include goals addressing his difficulties with decoding, phonemic awareness,

and word problems.

### 2.    Academic Progress

Finally, plaintiffs contend that HRA denied S.S. a FAPE because he failed to make

adequate academic progress.  (AR at 27-28.)  However, as the Court has already explained, when

judged prospectively, rather than with the benefit of hindsight, the evidence in the record

supports the conclusion that S.S.'s February 2007 IEP was reasonably calculated to enable him

to receive a meaningful educational benefit.  This is the relevant test, not whether, *ex post*, S.S.

can be deemed to have actually derived educational benefits.[15]

### D.    Remedy for Failure to Deliver ESY Services

As set forth above, the Court concludes that HRA's failure to provide S.S. with ESY

services during the summer of 2007 constituted a material failure to implement his IEP and thus

a denial of a FAPE.  Plaintiffs have requested both here and before the hearing officer

compensatory education to remedy the denial.  "Under the theory of 'compensatory education,'

courts and hearing officers may award 'educational services . . . to be provided prospectively to

---

[15] Nonetheless, the Court notes that the record does contain some evidence, albeit conflicting,
that S.S. derived a meaningful benefit in some areas.  For example, S.S.'s grade in
reading/language arts improved from an "F" in the first quarter of the sixth grade to a "C" by the
final quarter.  In addition, S.S.'s February 2007 IEP reflected progress on two of six social-
emotional short-term objectives, and Ms. Nelson, the school psychologist, testified that S.S.
made progress on taking responsibility and being accountable for his work.  (AR at 779.)  Dr.
Wilding testified that S.S.'s achievement test scores improved in math from 2005 to 2007.  (AR
at 552.)

compensate for a past deficient program.'" *Reid ex rel. Reid v. District of Columbia*, 401 F.3d

516, 518 (D.C. Cir. 2005) (quoting *G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295,

308 (4th Cir. 2003)).  Compensatory education is an equitable remedy requiring a flexible, fact-

specific approach aimed at fashioning an award "reasonably calculated to provide the

educational benefits that likely would have accrued from special education services the school

district should have supplied in the first place." *Id.* at 524.  The Court may not assume that

S.S.'s ultimate placement at Accotink Academy compensated him for HRA's failure to deliver

ESY services during the summer of 2007.  *See id.* at 525 (finding that the district court should

have required DCPS to offer proof that the student's new placement compensated for prior FAPE

denials in addition to providing some benefit going forward).

  While plaintiffs have offered an individually-tailored assessment of S.S.'s academic

deficits and his compensatory education needs (*see* AR at 241-44, 533-70), this evidence

assumed that S.S. was entitled to compensatory education for the denial of a FAPE during his

entire fifth and sixth grade school years and was not specifically tied to the failure to offer ESY

services during the summer of 2007.  Accordingly, the Court will remand this case to the hearing

officer for a determination of what would be an appropriate compensatory education award to

compensate S.S. for HRA's failure to deliver ESY services during the summer of 2007.  *See*

*Brown v. District of Columbia*, No. 07-0368, 2008 U.S. Dist. LEXIS 58334, *24-25 (D.D.C.

Aug. 1, 2008) (remanding case to hearing officer for a determination of an appropriate award of

compensatory education for the District's four-month denial of a FAPE where plaintiffs' expert

testimony encompassed the total amount of compensatory education due for more than just the

four-month period).  In making this determination, the hearing officer should limit his

consideration to S.S.'s "specific educational deficits resulting from his loss of FAPE [during the

summer of 2007] and the specific compensatory measures needed to best correct those deficits."

*Reid*, 401 F.3d at 526.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that plaintiffs have established by a preponderance of the evidence that HRA's failure to provide S.S. with ESY services during the summer of 2007 constituted a denial of a FAPE but that plaintiffs have not otherwise established a denial of a FAPE.  Accordingly, plaintiffs' motion for summary judgment will be granted in part, defendant's motion for summary judgment will be granted in part, and this matter will be remanded to the hearing officer for further proceedings to determine an appropriate award of compensatory education for HRA's denial of a FAPE during the summer of 2007.  A separate order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: November 12, 2008